[S. F. No. 59.   In Bank.—May 4, 1897.]

## In the Matter of the Estate of MARY A. REDFIELD, Deceased.

116  637
f132 187
132  396
116  637
140  411
116  637
149  248

Estates of Deceased Persons—Contest of Will—Petition to Revoke Probate—Appearance by Guardian—Capacity of Petitioner—Uncertainty—Appeal—Review of Order denying New Trial.—Where a petition for the revocation of the probate of a will is in form the petition of the mother of the deceased, but she is therein represented as appearing by her guardian, though the petition contain no allegation that she is under disability, nor that a guardian has been appointed for her, any defect in the pleading arising from uncertainty as to her capacity to institute the contest is not assignable as error on appeal from an order denying a new trial.

Id.—Answers—Refusal of Amendment—Discretion—Estoppel of Petitioner as Sole Heir—Benefits Taken under Will.—Where the respondent to the petition for the revocation of probate, near the close of the trial, asked leave to amend their answers by adding allegations thereto, showing that the petitioner, who would take as sole heir, if the will were overthrown, had received regularly an allowance of eighty dollars per month bequeathed to her by the terms of the will, for the purpose of raising an estoppel against the contestant, but made no showing why the matter proposed was not pleaded earlier, it was discretionary with the court to refuse the amendment.

Id.—Testimony of Physician—Privileged Information—Treatment of Deceased for Consumption—Knowledge of Mental Condition.— Where a physician who attended the deceased in her last illness testified that he treated her for consumption and not for mental disorder, but that he got no information about her condition, physical or mental, except as a physician to enable him to take care of her, it is not error to refuse to allow the question to be put to him as to whether her mind was affected, as against an objection that the information thus sought was privileged.

Id.—Undue Influence—Insufficiency of Evidence.—A verdict affirming a charge that the will was procured through undue influence exerted by the executor and the residuary legatee, cannot be sustained, where the evidence to support it is no stronger than that held insufficient in previous decisions of this court.

Id.—Insanity of Deceased—Mental Delusions not Affecting Testamentary Action—Insufficiency of Evidence.—A will cannot be rejected on account of insane delusions of the testator, which are not operative in the testamentary act, and which do not relate to the persons or objects affected by it; and a verdict setting aside a will on the ground of insanity of the testatrix is not sustained by the evidence, where the proof shows that she had business capacity, and made the will intelligently, without action indicating a deranged mind as to its subject matter or execution, notwithstanding proof of her unfounded fancies and delusions as to other matters.

Id.—Delusion as to Property of Sister not an Heir or Legatee.—A mere fleeting vagary as to property of a sister of the testatrix, does not

amount to an insane delusion; but even if it should become a fixed delusion, the sister not being an heir, who could be benefited by the rejection of the will, it seems that it cannot be rejected on account of such delusion.

ID.—TESTIMONY OF EXPERTS—FUTILITY OF ABSTRACT OPINIONS—MENTAL CAPACITY OF TESTATOR.—The mere abstract opinion of any witness, medical or of any other profession, is not of any importance; but the opinions of witnesses must be brought to the test of facts, that the court or jury may judge what weight the opinion is entitled to; and no court is justified in deciding against the mental capacity of a testator upon the mere opinion of witnesses, however numerous or respectable.

ID.—PROVINCE OF JURY—INFERENCE OF FACT—ASSISTANCE OF OPINION—DUTY OF COURT.—It is the province and duty of the jury to draw the inference of fact from the evidence before them, under the rules of law stated by the court, being assisted but not superseded in that function by the opinions of experts; and it is equally the duty of the court to determine whether there is satisfactory evidence to justify the conclusion reached by the jury.

APPEAL from an order of the Superior Court of the City and County of San Francisco denying a new trial. J. V. COFFEY, Judge.

The facts are stated in the opinion.

*R. E. Houghton,* for Specific Legatees, Appellants.

The petition is insufficient, in not showing that Joseph Bowden is an interested party, nor that he is the appointed guardian of Mary Bowden. (Code Civ. Proc., secs. 456, 1327; *In re Sanborn,* 98 Cal. 103; *In re Hickman,* 101 Cal. 609; *Young* v. *Wright,* 52 Cal. 407; *Judah* v. *Fredericks,* 57 Cal. 391; *Barfield* v. *Price,* 40 Cal. 535; *Kelly* v. *Murphy,* 70 Cal. 560; *Burling* v. *Thompkins,* 77 Cal. 258; *Sheldon* v. *Hoy,* 11 How. Pr. 14–15; *Hulbert* v. *Young,* 13 How. Pr. 413; *Merritt* v. *Seaman,* 6 N. Y. 171–74; *White* v. *Joy,* 13 N. Y. 83.) The court erred in refusing to permit evidence of the receipt of eighty dollars per month under the will, by Mrs. Bowden, and in refusing to allow an amendment to the answer to justify the evidence. (*Hutchinson* v. *Ainsworth,* 63 Cal. 286; *Gould* v. *Stafford,* 101 Cal. 34.) Mrs. Bowden was estopped by her acceptance of benefits under the will. (1 Jarman on Wills, chap. 15; Story's Equity Jurisprudence, sec. 1077; *Morrison* v. *Bowman,* 29 Cal. 347–48, 352; *Etche-*

*borne* v. *Auzerais*, 45 Cal. 121; *Noe* v. *Splivalo*, 54 Cal. 207; *Estate of Stewart*, 74 Cal. 98; *Hyde* v. *Baldwin*, 17 Pick. 308; *Smith* v. *Smith*, 14 Gray (Mass.), 533; *Tyler* v. *Wheeler*, 160 Mass. 209; *Haack* v. *Weicken*, 118 N. Y. 74; *Chipman* v. *Montgomery*, 63 N. Y. 221–22; *Kinnaird* v. *Williams*, 8 Leigh. 400; 31 Am. Dec. 658.) The evidence does not tend to show undue influence overcoming free agency. (*Goodwin* v. *Goodwin*, 59 Cal. 560; *Estate of Carpenter*, 94 Cal. 406; *Higgins* v. *Carlton*, 28 Md. 115; 92 Am. Dec. 667; *Waddington* v. *Busby*, 45 N. J. Eq. 173; 14 Am. St. Rep. 706.) Where there is capacity to make a will, mental weakness or eccentricity, or insane delusions on other matters cannot invalidate the will. (Chaplin on Wills, p. 18; Beach on Wills, sec. 97; *Potts* v. *House*, 50 Am. Dec. 350; *Bundy* v. *McKnight*, 48 Ind. 514–15; *Lee* v. *Lee*, 4 McCord, 183; 17 Am. Dec. 722.)

*Chickering, Thomas & Gregory*, and *Van Ness & Redman*, for Executors and Residuary Legatee, Appellants.

The evidence does not sustain the finding of insanity of decedent at the time of executing the will, it appearing that she then knew that she was disposing of her property by will, and to whom she was giving it, and the general character of the property. (*Thompson* v. *Ish*, 99 Mo. 160; 17 Am. St. Rep. 552, 563–64; *Waddington* v. *Busby*, 45 N. J. Eq. 173; 14 Am. St. Rep. 706; *Stevens* v. *Van Cleve*, 4 Wash. (C. C.) 262; *Eastis* v. *Montgomery*, 95 Ala. 486; 36 Am. St. Rep. 227; *Hawkins* v. *Grimes*, 13 B. Mon. (Ky.) 257–72; *Carpenter* v. *Calvert*, 83 Ill. 62–71; *In re Cline*, 24 Or. 175; 41 Am. St. Rep. 851; *Chrisman* v. *Chrisman*, 16 Or. 127.) The testimony of the medical expert carries little or no weight against the manifest fact showing competency. (*Burley* v. *McGough*, 115 Ill. 11; *Carpenter* v. *Calvert*, 83 Ill. 62, 69.) The evidence is insufficient to show undue influence, destroying free agency. (*Goodwin* v. *Goodwin*, 59 Cal. 560; *Estate of Carpenter*, 94 Cal. 406; *Trost* v. *Dangler*, 118 Pa. St. 259; 4 Am. St. Rep. 593;

*Herster* v. *Herster*, 122 Pa. St. 239; 9 Am. St. Rep.
95; *Thompson* v. *Ish*, 99 Mo. 160; 17 Am. St. Rep. 552;
*Knox* v. *Knox*, 95 Ala. 495; 36 Am. St. Rep. 235; *Marx*
v. *McGlynn*, 88 N. Y. 357, 370.) The court erred in
refusing to permit Dr. McNutt to testify as to the men-
tal condition of the testatrix, resting upon observation
not connected with the disease for which he was pre-
scribing. (*Campau* v. *North*, 39 Mich. 606; 33 Am. Rep.
433; *Collins* v. *Mack*, 31 Ark. 684; *Scripps* v. *Foster*, 41
Mich. 742, 748–49; *Staunton* v. *Parker*, 19 Hun, 55;
*Brown* v. *Rome etc. Co.*, 45 Hun, 439.) The court erred
in not allowing proof that contestant received payments
under the will. (1 Jarman on Wills, 2d Am. ed., 214;
*Hamblett* v. *Hamblett*, 6 N. H. 333; *Holt* v. *Rice*, 54 N. H.
398; 20 Am. Rep. 138; *Bell* v. *Armstrong*, 1 Add. 365;
*Braham* v. *Burchell*, 3 Add. 243.) "The upsetting of
wills is a growing evil." (*Estate of Carriger*, 104 Cal.
84.)

*Reddy, Campbell & Metson*, for Respondent and Con-
testant.

The evidence shows habitual insanity, and business
transactions are no test of sanity, and testimony thereof
is of no weight. (*American Seaman's Friend Soc.* v.
*Hopper*, 33 N. Y. 631.) In cases of habitual insanity,
mental soundness at the time of the will cannot be pre-
sumed, but must be clearly proved. (1 Jarman on Wills,
65 et seq; 2 Greenleaf on Evidence, sec. 689; 1 Redfield
on Wills, c. 3, sec. 5 (25); *Cochran's Will*, 15 Am. Dec.
116, and notes; *Will of Cole*, 49 Wis. 179; *Cartwright* v.
*Cartwright*, 1 Phill. 100; *Saxon* v. *Whitaker*, 30 Ala. 237;
*Attorney General* v. *Parnther*, 3 Bro. Ch. 441; *Bitner* v.
*Bitner*, 65 Pa. St. 347; *People* v. *Francis*, 38 Cal. 183–89.)
Direct evidence of undue influence can hardly be ex-
pected; and it may be inferred from circumstances.
(*Delafield* v. *Parish*, 25 N. Y. 95; *Tyler* v. *Gardiner*, 35
N. Y. 559; *Flint's Estate*, 100 Cal. 399; *Lansing* v. *Russell*,
3 Barb. Ch. 325–340; *Marsh* v. *Tyrrel*, 2 Hagg. Ecc. 84;
*Crispele* v. *Dubois*, 4 Barb. 397–98.) All the information

of Dr. McNutt as to the mental condition of deceased, having been acquired while acting in a professional capacity, the law seals his lips. (*Feeney* v. *Long Island R. R. Co.*, 116 N. Y. 380; *Grattan* v. *Metropolitan L. Ins. Co.*, 80 N. Y. 281; 36 Am. Rep. 617; *Renihan* v. *Dennin*, 103 N. Y. 573; 57 Am. Rep. 770; *Estate of Flint*, 100 Cal. 399.) The reason of the rule of estoppel from the acceptance of benefits does not apply to one who is entitled to the whole estate. The contestant, being insane, and suing by guardian, could not waive any right. (Civ. Code, sec. 40.) Questions as to the sufficiency of the pleading cannot be considered on this appeal from an order denying a new trial. (*Spanagel* v. *Dellinger*, 38 Cal. 283; *Mason* v. *Austin*, 46 Cal. 387; *Jacks* v. *Buell*, 47 Cal. 163; *Martin* v. *Matfield*, 49 Cal. 46; *Onderdonk* v. *San Francisco*, 75 Cal. 534–539; *Wheeler* v. *Kassabaum*, 76 Cal. 90–92; *Brison* v. *Brison*, 90 Cal. 326; *Evans* v. *Paige*, 102 Cal. 133.)

The COURT.—When this cause was pending in Department, an opinion was prepared by Commissioner Britt, and concurred in by Commissioners Vanclief and Haynes. The case was subsequently ordered into Bank. After a full hearing by the court, and a careful examination of the entire case, we are satisfied that we cannot give better expression of our views than by adopting Commissioner Britt's opinion, which we accordingly do; and, for the reasons therein stated, the order appealed from is reversed, and cause remanded for a new trial.

The following is Commissioner Britt's opinion:

BRITT, C.—Mary A. Redfield, late of the city and county of San Francisco, died of pulmonary consumption October 4, 1891, being then aged about fifty years. She left a will, executed September 14th next previous, which was admitted to probate on October 21, 1891; by its terms she disposed of the whole of her estate, which was of the value of seventy-three thousand dollars or

CXVI. CAL.—41

thereabouts. Her maiden name was Bowden; she was married in 1870 to one Francis S. Redfield, who died in 1881, and from him she derived the property which, with its accretions, was the estate disposed of by said will. The legacies given by the terms of the will were as follows: To the brothers of the testatrix, William, Joseph, and Andrew Bowden, one hundred dollars each; to her sister, Ellen Simmons, three thousand dollars; to certain children of said sister, sums amounting to four thousand two hundred and fifty dollars; to her mother, Mary Bowden, eighty dollars per month during her life, the executor being required to retain in his hands, upon distribution of the estate, sufficient property to produce an income of that monthly sum, and to pay the same " to my sister, Ellen Simmons, who is enjoined to expend the whole of said amount in the support and maintenance of our mother"; to ten named relatives of her deceased husband, sums aggregating four thousand five hundred dollars; and the residue was given to her nephew, one Walter E. Johnson, upon condition that he assume " by proper legal process the name of Francis E. Redfield," which condition he complied with. One Winslow G. Hall was named executor in the will, and he received letters accordingly.

On October 6, 1892, a petition was filed on behalf of testatrix's mother and heir at law, said Mary Bowden, praying the revocation of the probate of the will upon various grounds, which are here reduced to these, viz., that the deceased was not of sound and disposing mind when the will was executed, and that its execution was procured through undue influence exerted upon her by the residuary legatee, and the executor Hall. An answer was filed by them, and, also separately, by the relatives of the husband of the deceased, named as legatees in the will. Special issues were submitted to a jury, and a verdict was returned in contestant's favor upon all of them; the court thereupon adjudged said instrument not to be the last will and testament of said deceased, and revoked the probate thereof. The appeal

is from an order denying appellant's motion for a new trial.

The contesting petition proceeded thus: "Now comes Mary Bowden . . . . by her guardian, Joseph Bowden, and contests and objects to the supposed and pretended will of Mary A. Redfield, deceased, . . . . and for her grounds of contest avers . . . . (1) That your petitioner is the mother of said deceased," etc.   It is subscribed—not by guardian—but by "attorneys for contestant."   It is now argued that the contest is subject to the rules governing civil actions (Code Civ. Proc., sec. 1716; *Re Flint*, 100 Cal. 400); that the petition is that of Joseph Bowden; and that it does not state facts sufficient to constitute a cause of action in his favor as an individual, because he has no interest in the estate (Code Civ. Proc. sec. 1327; *Re Sanborn*, 98 Cal. 103); nor as guardian, because it is barren of averment to show his capacity as such.   But plainly the petition is that of Mary Bowden; it contains no allegation that she is under disability, nor that a guardian has been appointed for her. If the manner in which the petition is prefaced created any uncertainty as to her capacity to institute the contest, the defect is yet not assignable as error on appeal from the order denying a new trial.   (*Evans* v. *Paige*, 102 Cal. 132, and cases cited.)

Near the close of the trial the respondents below asked leave to amend their answers by the addition of allegations showing that the contestant had received regularly from the executor the sum of $80 per month bequeathed to her by the terms of the will; this for the purpose of raising an estoppel against contestant, founded on the acceptance of benefits under the will. (*Hamblett* v. *Hamblett*, 6 N. H. 333; *Hyde* v. *Baldwin*, 17 Pick. 308; *Morrison* v. *Bowman*, 29 Cal. 337.)   Admitting that the rule invoked should have any application in this case where the contestant is the sole heir of the deceased, and therefore entitled to the whole estate if the will is overthrown, a proposition which her counsel deny, it was yet discretionary with the court to refuse

the amendment, and we cannot say that its discretion was abused; there was no showing why the matter was not pleaded earlier.

A physician, Dr. McNutt, attended the deceased in her last illness, being called early in September, 1891. He testified that he treated her for consumption, and not for any mental disorder; that he got no information about her condition, either physical or mental, except as a physician to enable him to take care of her. Proponents then put to him the question whether her mind was affected; contestant objected on the ground that the information sought was privileged, and the objection was sustained by the court. "A licensed physician or surgeon cannot, without the consent of his patient, be examined in a civil action as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient." (Code Civ. Proc., sec. 1881.) The question is whether the knowledge of the mental condition of Mrs. Redfield acquired by the physician "was necessary to enable him to prescribe or act" for her in the treatment of her disease. This was a matter of fact to be determined preliminarily by the judge of the trial court; and upon the information before him we cannot say that his conclusion was erroneous; the sole care of her had by the physician, being in the treatment of the disease, his statement that he received no information about her except as a physician to enable him to take such care, standing unqualified as it did, justified the inference that this knowledge was necessary to enable him "to prescribe or act" for her. (See in this connection *Estate of Flint, supra; Edington* v. *Ætna L. Ins. Co.*, 77 N. Y. 564; *Hoyt* v. *Hoyt*, 112 N. Y. 493; *Steele* v. *Ward*, 30 Hun, 555; *Staunton* v. *Parker*, 19 Hun, 55.)

As to the verdict affirming the charge that the will was procured through undue influence exerted by Hall, the executor, and Johnson, the residuary legatee, it is enough to say that the evidence wholly fails to sustain it—being materially weaker in that regard than that

adduced to justify the same charge in the recent cases of *Herwick* v. *Langford,* 108 Cal. 608, and *Re McDevitt,* 95 Cal. 17, in each of which this court held the verdict to be without support, and not materially stronger than that held insufficient in *Estate of Carpenter,* 94 Cal. 406.

The serious question in the case is whether the evidence justifies the verdict that the deceased was of unsound mind when she executed the will. We approach this mindful that any substantial conflict in the evidence must be determined here in contestant's favor; that the court below has signified its satisfaction with the conclusions of the jury, and that its ruling on the result of the facts in evidence before it ought not to be reversed unless manifestly infected with error.

The deceased occupied a house owned by her situated on Taylor street, between Union and Filbert streets, in San Francisco. Her property consisted mainly of real estate and of interests in certain shipping; her husband had owned shares in several vessels jointly with Capt. Hall, the executor named in this will, who was his close friend; after her husband's death, Hall had the principal oversight of her interests in the vessels and accounted to her for her share of the receipts therefrom; her income was $5,000 per year or more. When the will was executed, and for some years previously, her household included, as nearly as we can make out, beside herself, her mother, aged at that date about eighty-three years; Walter E. Johnson, the residuary legatee, and a servant; a niece, Nellie L. Simmons, had also for the space of eleven years been accustomed to sleep and spend a great, perhaps the greater, part of the time at her house, being her nurse in her last illness. Said Johnson's mother was the sister of the testatrix; she died in November, 1881; previously, in 1877, Johnson being then a lad about eleven years old, and his father long since deceased, he was taken into the home of Mrs. Redfield and her husband and lived with them until Redfield died; after that he remained with his aunt, the testatrix, being supported by her,

and in return rendering services of rather miscellaneous character; he says: " I worked around the property" (her houses), "and took as good care of it as I knew how, and did whatever I could around there"; another witness testified that Johnson did "what he could to help her, working around the house, keeping the place in repair, helping and looking out for things." Mrs. Simmons, sister of the testatrix, lived close by; she and her daughters were on terms of intimacy with the testatrix.

We state the more important parts of the evidence for contestant as briefly as may be done consistently with clearness. Said Nellie L. Simmons testified that Mrs. Redfield was sick for a month before her death— sometimes sitting up for a few hours and sometimes in bed; that in her judgment testatrix was not of sound mind when the will was executed. " My reasons were because she acted so; she would sit for hours at a time and even for a day and stare into vacancy with her mouth open. At other times she imagined that the neighbors were peering at her and trying to see into her affairs when they were going about their own work. She would lock the doors to all the rooms and carry the key in her pocket. She would remove different articles of furniture from different rooms. She would take one article from one room and put it in another. She took the wardrobe from one room and placed it in another because she did not want the sun to strike on it, when the sun did not strike on it at all. She removed the hat-rack from the hall and put it in the girl's room for fear of scratching the paint; she took the books from the book-case that was always locked. She acted as if she was haunted; she slept in most all the rooms of the house; took opium pills to produce sleep, took them for about three years, off and on; was afraid to go down Filbert street for fear the groceryman's wife would see her, and she would go up Taylor street and that was a steep hill; she gave no reason for not wishing the groceryman's wife to see her; it was just her imagina-

tion; she would lock the doors for no cause whatever—parlors, bedroom doors, and the library door. . . . . During her last illness and prior to the execution of this will I noticed her condition particularly. At times she was not able to conduct and carry on a connected conversation, and at times she was. Sometimes she would commence to converse and before she finished what she was talking on she would go off into a doze, and if we aroused her she would not remember what she had been talking about; this was quite frequent during her last sickness; her face had a far-away look, as if her mind was affected, staring far away. If she was spoken to sharply while she had that look, it would startle her, and that would bring her back to her apparent self, at times. The will was made September 14th. Prior to this time she had been irritable and sometimes got excited at the least thing. She told me that she had packed her dishes up; she was afraid of having them broken—when she had not done so; she said she was going to move; I investigated and there was nothing packed at all; said she had to go to Piedmont and was going to stay there, while she had nothing at all prepared to go; then said she was going to move to Berkeley, and she spoke of moving to the Mission, and of taking a room a block away on Filbert street. Said there wasn't a room in the house she could get a fire in or any heat. There could have been a fire in the library, in her bedroom, or the girl's room or the room I slept in. She knew there were appliances for fire; the house has eleven rooms. She very seldom went out; was often silent, and during the latter part of her life quite frequently sat looking into vacancy. It was September 1, 1891, that she was taken sick. She had no company to speak of after January, 1881. When my mother and other members of her family went to see her she would sometimes act all right, and sometimes she would sit and have hardly anything to say; she seldom visited our house; she never visited her other relatives at all; had two brothers here whom she didn't visit. At times she was very friendly with

Ned " (Johnson, the residuary legatee), "and at times unfriendly; sometimes she would be cross and then very fine. She often said she could not afford this and that; she didn't have enough nourishing food in the circumstances she was in; would say she could not afford it. I never spoke to Ned in relation to my aunt's want of nourishing food. My grandmother's mind has been affected eight or nine years. One of my uncles has shown peculiarities like those of Mrs. Redfield."

Mrs. Bruce, also a daughter of Mrs. Simmons, testified that on one occasion Mrs. Redfield said to her, "Well, your mother has got just as much money and more than I have; she has a right to take care of grandmother," meaning the contestant; that she, the witness, replied, "You know you are not telling the truth; you know you have more money than ma, and can afford to take care of grandmother"; that in fact Mrs. Simmons was poor—"just had the house we lived in." That she saw testatrix during her last illness; thought she looked like an imbecile; said she was getting ready to go to the country, and had a quantity of clothing bought which she never used. Before her last sickness she would not allow gas to be burned in the house, it cost too much; "when sleeping there we were obliged to go to our rooms with candles"; the majority of the inside rooms were kept locked, she giving as a reason that she did not want the servant girl going in when she was not there; became enraged at trifles; would storm around a good deal and then calm down again.

Joseph Bowden, brother of the deceased, testified that in his opinion she had not been of sound mind for the last thirty years; that their mother was twice confined in an insane asylum about the years 1842–3; that his father had told him that his mother's father became insane; that a sister of deceased, Johnson's mother, died while insane and confined in the asylum at Napa. That deceased thought a certain physician who was going around the neighborhood a good deal was trying to get

hold of her property, when he was merely courting a girl whom he afterward married; that his nieces got up a surprise party for Mrs. Redfield, and this made her angry; said she didn't want anybody to come there; they destroyed her carpets and the paper on the wall; said she was sorry she had discharged a kitchen girl for playing on the piano in her absence; imagined everybody was interested in her affairs for the purpose of taking advantage of her; never had any company; often complained about having to keep Johnson when he was a small boy; complained of the expense and trouble of keeping her mother when the latter had had a fit of aberration of mind; had said she knew everybody was trying to get the best of her. She was married in 1870; on the first New Year's day after her marriage her husband prepared to receive visitors; he went out, and then she went to her father's house and staid all day, and left the Chinaman to entertain the callers.

Mrs. Clark, another daughter of Mrs. Simmons, testified that she slept with her aunt from 1881 to 1886, because she said she didn't like to sleep alone after her husband's death; judged her to have been of unsound mind during last two or three years of her life; at times she had hardly proper clothing; was afraid of her neighbors, especially one or two of them; on August before her death she refused to buy a glass of jelly at fifty cents, saying she was not able to pay for it: when spoken to about her clothing she would say, "Probably next month I will have more money to get it"; she suffered from asthma.

A Mrs. Russell testified that she had been much at Mrs. Redfield's house—with her nieces it appears; thought she was the most peculiar person she ever met; thinks she could not have been of sound mind; "she would make you take off your shoes to go up stairs for fear of wearing out the carpet; have known her to sleep in the library very often on a cot, and in all the rooms in the house; she gave as the reason for going around she could not sleep."

There was other testimony for contestant cumulative of much of that above detailed, but nothing adding materially to its substance. Several physicians testified upon hypothetical questions put to them that they considered the subject of the interrogatories to be of unsound mind.

On the other hand, we observe first the method with which deceased set about making the will. Said Nellie Simmons, testifying for contestant, stated: "A little after the first of September I knew my aunt contemplated making a will. She said to me if she knew she was going to die she wanted to put her affairs in shape. She wanted me to ask the doctor first." She did ask the doctor, and reported to her on September 12th that her illness was probably fatal. Mrs. Redfield at once sent for Captain Hall. It further appears without conflict that when Hall came she told him she desired to make a will, and dictated to him notes of the same, of which he made memoranda for the information of an attorney. She said that she wanted to make Johnson "her heir," and wanted him to take the name of Redfield; she then gave him from memory the names of the other persons she desired to make legatees, and stated the amounts she wished to give them respectively; stated she was not on good terms with two of her brothers, and as reason for not giving more to a third that she did not know whether he was divorced. The will was prepared from these memoranda by Mr. Warren Olney, an attorney at law. When the first draft was presented to her she caused some alterations to be made, increasing the legacy to Nellie Simmons from $1,000 to $2,000, and changing it in some other particulars. It was finally executed at her house on the afternoon of September 14th, Mr. Olney and one Samuel Foster being the subscribing witnesses. The testimony of both of them on the trial was that she seemed to be perfectly sane, and that they so considered her. The former, a lawyer of many years standing, testified: "She did not look to me as if she were going to die very soon,

and she talked with perfect intelligence. She took the will and commenced to read, and then spoke to me and said: 'It is not necessary for me to read it aloud, is it?' I said, 'Certainly not.' She read it through carefully. I asked her if that was in accordance with her wishes; she said it was. . . . . That is the only time that I ever saw her. . . . . I paid particular attention to Mrs. Redfield at that time. I knew she was sick, and I wanted to be satisfied that this will was not to be executed under any improper circumstances." Miss Simmons and her sister, who were with their aunt on that day, say that sometimes she seemed rational and sometimes not. Two days before she gave to Mrs. Simmons her diamonds, watch and chain, ring and pin. Throughout the affair of the preparation and execution of the will we find no evidence of word or act on the part of the testatrix indicative of a deranged mind.

But it is contended that her mind was affected with "general" or "settled" insanity, and hence, presumptively, it was unsound when she made the will. Opinions of witnesses aside, there are several broad facts which do not consist well with that view. She had been administratrix of her husband's estate; the property he left to her increased under her charge from a valuation of some $35,000 to about double that amount. So far as shown no one asserted her to be insane while she was yet alive. She had the care of her aged and imbecile mother, apparently without protest that she was incompetent for that purpose from any of those who now testify their opinion that she was insane. She kept with her own hand regular accounts of her disbursements and various other transactions for a series of years commencing in 1885 and ending but a few months before her death; these fill several hundred pages of the printed transcript in the case. No doubt she was penurious; yet her brother, who was poor, and who testified his belief that she was of unsound mind, assigning her short-sighted economy among the reasons, had nevertheless occupied one of her houses free of rent for seven

years before her death. ·We note also in her said accounts that she was accustomed to make cash gifts varying from $2.50 to $20 at each Christmas season to several young relatives, and that those to Johnson usually greatly exceeded any of the others; tending to show that her disposition to favor him especially did not arise as a sudden caprice when the will was made.

The executor and others who knew her well gave testimony of their belief that she was sane and the grounds thereof; and most of her eccentricities of conduct, apparent in the summary we have given, take a quite rational coloring from other evidence in the case. But without entering into a consideration of this, and allowing that to support the verdict the whole evidence must be viewed in the phase least favorable to her sanity, it tends to show that she exhibited peculiarities of mind in the following particulars: 1. Parsimony; 2. Aversion to society; 3. Irritability; 4. Unfounded fancies—delusions. As to the first three traits, we do not understand contestant to maintain that they have greater effect in the case than to accentuate the inference of unsoundness founded on other circumstances. It is commonly held that aside from those cases of dementia where the patient has not mental power to form any conceptions whether true or false, of the relations of things, the true test of insanity is mental delusion; that if a person persistently believes supposed facts which have no real existence, and against all·evidence and probability conducts himself upon the assumption of their existence, he is as to that belief under a morbid delusion, and delusion in that sense is insanity. (*American Seamen's Friend Society* v. *Hopper*, 33 N. Y. 624.) But before a will can be rejected on that account it must appear that "its dispository provisions were or might have been caused or affected by the delusion" (*Id.*, 625); delusions which are not operative in the testamentary act—do not relate to the persons or objects affected by it—are not permitted to invalidate it. Now in the present instance the illusions of the testatrix had no relation to any per-

son or object affected by the will; that she falsely imagined herself to have made preparations for a journey, or that she could get no fire or heat in any of her rooms, or that her carpets or walls would be marred by slight usage, or that her neighbors were prying into her affairs, or that the doctor paying court to a young woman of the vicinity had designs upon her property, or all of these together—fall short of showing that she was under any delusion respecting her relations with her mother, or other kindred, or respecting her property or the distribution of it provided by the will. Thus, for example, where a testator imagined that but one half of his body was alive, that he breathed with one lung only, and that but one half of his heart performed its functions, etc.; dosed himself in a most extraordinary manner, and finally committed suicide; the provisions of his will being unaffected by the delusion, it was upheld. (*Hollinger* v. *Syms*, 37 N. J. Eq. 221; *Field* v. *Shorb*, 99 Cal. 661; *Estate of Spencer*, 96 Cal. 448; *Banks* v. *Goodfellow*, L. R. 2 B. Cas. 549; *Rice* v. *Rice*, 53 Mich. 432; *American's Seamen's Friend Society* v. *Hopper*, 33 N. Y. 619; *Thompson* v. *Kyner*, 65 Pa. St. 378; *Matter of Vedder*, 6 Dem. 92, and numerous cases there cited.) In the Vedder case some of the reported extravagancies in speech and act of the testatrix make those of Mrs. Redfield seem scarcely irregular in comparison, yet the will was admitted to probate.

Counsel say, however, that "this will was made under two false impressions which went to the very root of its provisions; that her sister was wealthy, and that she herself was poor." The chief support for this contention, apart from the penurious habits of the testatrix, seems to be her single remark related by Mrs. Bruce, daughter of the sister referred to: "Well, your mother has got just as much money and more than I have; she has a right to take care of grandmother." But the whole case is inconsistent with the existence of any such fixed belief in the mind of the deceased; that such an opinion shall amount to an insane delusion, it must be a real

belief—not simulated, and must be persistent, not a fleeting vagary; the facts are that the grandmother lived with Mrs. Redfield, and had no support from any other quarter, so far as appears; by the terms of the will testatrix gave her sister $3,000, and her mother $80 per month during her life, directing the retention of sufficient property in the hands of the executor as trustee to produce that amount; this, allowing for a return of six per cent, would require $16,000; other legacies' amounted to near $10,000; after these came the provision for Johnson, whom she designed to "make her heir"; in view of death she gave to her sister her diamonds, watch and chain, ring, and pin. Within a year preceding she had fixed a price at which she authorized the sale of certain real property at above $26,000. Obviously, we think, she was not insensible of the amount of her property, however close she may have been in its expenditure; nor of the claims of her sister upon her bounty. Besides, the reply made by the witness to the remark of Mrs. Redfield quoted above indicates that her statement was not considered expressive of any rooted conviction: "You *know* you are not telling the truth; you *know* you have more money than ma, and can afford to take care of grandmother." Moreover, it is not clear, even if the testatrix had the insane delusion that her sister was rich, that this would be ground for rejecting the will; the sister is not an heir, and in contemplation of law would receive no benefit from the intestacy of deceased; and it has been held that a court will not refuse probate to a will "unless, by so doing, the person concerning whom the delusion existed will be benefited." (*Stackhouse* v. *Horton*, 15 N. J. Eq. 202.)

We do not overlook the circumstance that there was a disposition toward insanity in the family of the deceased. But not all, nor a majority, of its members were of unsound mind; it cannot be assumed that she inherited the insane and not the sane tendencies of her family. Her mother's aberration seems to have recurred only at long intervals. Besides, there is no evidence

that any of her insane relations were affected as she was; much of the expert testimony related to the supposed "phthisical insanity" of the deceased, but it did not appear that any other of her family had phthisis.

It was in evidence for contestant that a brother of deceased had exhibited peculiarities similar to hers, yet it appears that he testified at the trial, and we find no charge that he was insane. Altogether, the evidence of the effect of heredity is so inconclusive as to add very little to the case made by contestant. (Buswell on Insanity, secs. 235–36, and cases cited.)

As to the testimony of medical experts, the following remarks of the Prerogative Court of New Jersey seem judicious: "The abstract opinion of any witness, medical or of any other profession, is not of any importance. No judicial tribunal would be justified in deciding against the capacity of a testator upon the mere opinion of witnesses however numerous or respectable. A man may be of unsound mind, and his whole neighborhood may declare him so. But whether that unsoundness amounts to incapacity for a discharge of the important duty of making a final disposal of his property, is a question which the court must determine upon its own responsibility. It . . . . is to be ascertained by the court by the application of certain rules of law in the exercise of a sound discretion regulated by these rules. The opinion of a witness must be brought to the test of facts, that the court may judge what estimate the opinion is entitled to. It is proper and legal to ask a witness his opinion as to the mental capacity of the individual to discharge the duty in question. The court will judge of . . . . the proper weight to be given to his opinion from the facts and circumstances upon which he founds his opinion." (*Stackhouse* v. *Horton, supra.*)

It was the province and duty of the jury to draw the inference of fact from the evidence before them regulated by the rules of law stated to them by the court— being assisted but not superseded in that function by

the opinions of experts. It is equally the duty of the court to determine whether there is any satisfactory evidence to justify the conclusion they reached; we find none, and therefore recommend that the order be reversed and the cause remanded for a new trial.

Rehearing denied.

GAROUTTE, J., dissented from the order denying a rehearing.