[S. F. No. 7913.   Department One.—March 20, 1917.]

In the Matter of the Estate of BETSEY H. COLLINS, Deceased. ALBERTINE COLLINS CHAPPELLE, Contestant and Respondent, v. W. E. WOODHAMS, Appellant.

WILL—EXECUTOR MAY APPEAL FROM ORDER REVOKING PROBATE.—Where a will has been admitted to probate and the executor is duly appointed and has taken up the administration of the estate, he represents all of the beneficiaries of the will. It then becomes his duty to protect their interests, and as such executor he has the right to oppose a contest of the will until the final decision thereof; consequently, he may maintain an appeal from an adverse judgment in the lower court.

ID.—EXECUTOR MAY APPEAL FROM ORDER REFUSING PROBATE.—A person named in a will as executor thereof, who petitions for its probate, is a "party aggrieved" by a decision refusing to admit the will to probate, and may appeal therefrom as provided in section 938 of the Code of Civil Procedure.

ID. — INSANITY — INSUFFICIENT EVIDENCE. — Extreme stinginess, repulsive or filthy personal habits, ill temper, jealousy, a dictatorial and disagreeable disposition, and a propensity to drive hard bargains do not constitute insanity or unsoundness of mind. They have no greater effect than to accentuate the inference of unsoundness founded on other circumstances.

ID.—MANIFESTATIONS OF SENILE DETERIORATION.—Attacks of aphasia and physical disabilities showing a considerable degree of senile deterioration, do not of themselves establish the insanity that is essential to render a person incapable of making contracts or a will.

ID.—NATURE OF INSANITY NECESSARY TO AVOID WILL.—The insanity which will avoid a will must be either insanity of such broad char-

acter as to establish mental incompetency generally, or some specific and narrower form, under which the testator is the victim of some hallucination or delusion. In the latter case the will must have been produced in whole or in part by the delusion or hallucination.

ID.—OPINIONS OF EXPERTS AS TO INSANITY—WEIGHT OF EVIDENCE.—The testimony of expert witnesses as to insanity, based on hypothetical questions skillfully framed to call for an answer favorable to the party in whose behalf it is asked, is evidence the weakest and most unsatisfactory.

ID.—OPINIONS INSUFFICIENTLY SUPPORTED BY FACTS.—When the opinions as to unsoundness of mind, including those of the intimate acquaintances, are based on facts which show neither morbid delusion nor total mental incapacity, which prove nothing more than personal peculiarities and habits, accompanied by physical weakness, occasional lapses or failure of memory, and defective nervous and muscular co-ordination, and it clearly appears that none of these frailties was present at the time of the execution of the will or affected its provisions in any way, the evidence is wholly insufficient to establish the fact.

APPEAL from an order of the Superior Court of Santa Clara County refusing to admit a will to probate. P. F. Gosbey, Judge.

The facts are stated in the opinion of the court.

William H. Johnson, for Appellant.

H. A. Blanchard, for Respondent.

SHAW, J.—This is an appeal from an order revoking the probate of the will of Betsey H. Collins, deceased.

The appellant has no interest in the estate except such as arises from the fact that he is the duly appointed and qualified executor of the will previously admitted to probate. The will provides for several legacies, and devises the residue of the property to the contestant. Respondent contends that the executor is not a party aggrieved and, hence, that he cannot maintain this appeal. This proposition is not well taken. When a will has been admitted to probate and the executor is duly appointed and has taken up the administration of an estate, he represents all of the beneficiaries of the will. It then becomes his duty to protect their interests, and as such executor he has the right to oppose a contest of the will until the final decision thereof; consequently, he may main-

tain an appeal from an adverse judgment in the lower court. (*Estate of Whetton,* 98 Cal. 203, [32 Pac. 970]; *Estate of McKinney,* 112 Cal. 447, 454, [44 Pac. 743]; *Estate of Dillon,* 149 Cal. 683, 685, [87 Pac. 379]; *Estate of Hite,* 155 Cal. 448, 457, [101 Pac. 448]; *Estate of Logan,* 171 Cal. 357, 362, [153 Pac. 388].)

The only question presented in the case is whether or not the evidence is sufficient to support the verdict of the jury that the decedent was not of sound and disposing mind at the time of the execution of the will.

The testatrix was the wife of Herman Collins. They had no children born to them. The contestant, Mrs. Chappelle, was adopted by them as their daughter when she was about two years of age, and lived with them until her marriage to Chappelle about the year 1909. The family formerly resided in South Dakota. Some ten years previous to her death they removed to San Jose, California. In May, 1912, Collins left his wife and went to England, remaining there until his death in May, 1915. The testatrix, in her later years, was afflicted with varicose veins in her leg. On October 28, 1914, a surgical operation was performed on her to remove them. At the time of making the will, on March 25, 1915, she was about seventy-five years of age. Her estate consisted of a farm in South Dakota, valued at about twelve thousand dollars, something over two thousand dollars on deposit in savings banks, and money loaned on secured notes amounting to two thousand five hundred dollars, besides some small articles of personal property. Before leaving his wife, Herman Collins executed a deed purporting to convey to the contestant the residence in which he and the testatrix had lived prior to his departure. This deed he placed in escrow to be delivered to the contestant upon his death, and it has since been delivered to her. The testatrix occupied this residence until her death. The will bequeaths a legacy of five hundred dollars each to two nieces, and a like amount to a nephew and his wife jointly. It also bequeaths one hundred dollars to the nephew and his wife for the upkeep of the graves of the father and mother of the testatrix. All the residue of the estate is given to Albertine C. Chappelle, the contestant.

The contestant and five other women, intimate acquaintances and near neighbors of the testatrix, each testified that in her opinion the testatrix was not of sound mind when she

executed the will. There was no other testimony on the subject except that of two physicians, one of them the husband of the contestant, who, in answer to hypothetical questions purporting to state the substance of the reasons given by the contestant's witnesses, each stated his opinion to be that she was of unsound mind. We will state as briefly as possible the facts given by the witnesses as the foundation for their opinions.

The testatrix did not eat enough, she was too close to feed herself properly, so close that she would not take proper nourishment, and if she saw anybody else eating plenty she thought that they spent too much money; she wanted so many vegetables for a nickel that the vegetable peddler refused to call at her house. She wanted the neighbors to cut down the lilac trees so that she could see her husband when he turned the corner. When she saw her husband give three peaches from his back yard to a neighbor woman she became very angry and thereafter was always talking about it. She was troubled frequently with aphasia, and would at such times try to tell things but could not make herself understood. One of these spells occurred about a month before the will was made. In these spells she would open and close her eyes, trying hard to think of the words, then give it up, then try again and fail. Her mouth was drawn to one side from paralysis of the facial muscles. After the operation mentioned she shuffled her feet in walking, as if she were unable to raise them. During the last two or three years she frequently asked a neighbor to do little errands for her, such as paying her taxes, buying her wood and the like. She grieved about her husband not coming back or writing to her. There did not seem to be, in the opinion of one witness, any good common sense to her talk. No instances, however, were given of this lack of common sense. After the operation in 1914 she lost flesh very rapidly and became very thin. Prior to that she was rather fleshy. She harbored a grudge against one of the witnesses because her husband had given the witness a chair and she was jealous about it. She never wanted anyone to have pleasure. When the contestant visited her for a month, in May, 1915, she did not seem to recognize her as she entered the room, but recognized her in a moment and broke down and cried. She did not inform the contestant of the operation for varicose veins, in October, 1914. She first told the

contestant to go home, and then when she got ready to go she begged her to stay. She was very suspicious, very disagreeable and ill-tempered, getting so agitated with anger that she would get weak and have to sit down and rest. Sometimes she could not be made to understand anything except by writing, which she would then try to read and would shake her head as if she did not understand it. She would not allow her daughter to do the washing for herself and children during the said visit for fear she would use more water than was permitted, and she would turn down the gas when the daughter was cooking in the kitchen, saying that it was wasting. She was always a woman it was nearly impossible to live with, always nagging and scolding, and was extremely penurious. This was true before the daughter's marriage in 1909. When eating she would grab the victuals in her hands and eat as if she were starving. She ate peas with a spoon and took meat in her fingers, when eating, seldom using a knife or fork. She would pick up partly eaten scraps out of other plates and sop up the gravy off the meat plate with a piece of bread, when visiting at a neighbor's after a meal. A few weeks after making the will she got some Easter cards to send to friends and her daughter. She did not know what to write on them, and was very much disturbed because of that fact, said she did not know how to put it on paper, and finally sent the cards without anything on them except the address. She was foolishly fond of money, and on one occasion hugged and kissed a cent piece given her by a neighbor. She had trouble with her left hand at times so that she could not move it very well, and she had to move it from one place to another with the other hand.

On the other hand, the evidence showed that, notwithstanding these peculiarities and physical conditions upon which the witnesses based their opinions that she was of unsound mind, during all of this time she was able to and did transact her ordinary business as before and without serious difficulty, except that which arose from her deafness. The savings bank accounts show that she was depositing and withdrawing money therefrom during this period. The two thousand five hundred dollars loaned as aforesaid was represented by eight notes bearing interest payable at different times, some annually, some semi-annually, and some quarterly. These loans were made for her by the appellant, Woodhams, who, during

all this time, was acting as her agent for that purpose. Before making a loan he would submit the proposition to her and she would approve it. She kept the notes and mortgages and all her other valuable papers in her own custody. As each installment of interest became due she would take the note to Mr. Woodhams' office, receive from him the interest paid and have it credited on the note. She kept a close account of the dates, and never failed to look after the interest promptly as it became due, or to select the right note from among her papers. She had loaned one hundred dollars to contestant's husband, Dr. Chappelle. In May, 1915, when the contestant was visiting the testatrix, and when she says she believes the testatrix was of unsound mind, the testatrix handed her this note and told her to give it to her husband as a present. The contestant received it without objection and delivered it as instructed. The testatrix knew the date when taxes became due, and made preparations in advance for paying the same. She made one loan just three weeks before the making of the will, and she withdrew money from the bank and deposited money therein shortly before and shortly after the making of the will. Those who transacted business with her testified that they saw no cause to question her capacity to transact business or the soundness of her mind. The will itself bears evidence of a rational mind. In view of the amount and character of her property and her family relations, the dispositions of her will seem entirely reasonable. She herself wrote the instruction stating how it was to be made, and it was prepared in accordance therewith after a prolonged consultation extending over two days, by Mrs. Smith, secretary to Mr. Woodhams. She brought the deed for the Dakota farm in order to have it correctly described in the will. She assisted in comparing the description in the will with that in the deed, she reading one paper and Mrs. Smith reading the other. Some fourteen months before the date of the will she wrote a letter to Woodhams concerning one of the loans. Its language is clear and forcible and the ideas sound and rational, showing a business capacity of a rather unusual character for so old a woman. There was no evidence of any sudden change in her mental condition. The aphasia and the difficulty in moving the left hand were first manifested shortly before the making of the will, but the peculiarity of habits, character, and disposition had, so

far às appears, existed for many years and while she was, in normal condition.

Extreme stinginess, repulsive or filthy personal habits, ill temper, jealousy, a dictatorial and disagreeable disposition, and a propensity to drive hard bargains do not constitute insanity or unsoundness of mind. As was said in *Estate of Redfield*, 116 Cal. 637, 652, [48 Pac. 794], they have no greater effect "than to accentuate the inference of unsoundness founded on other circumstances." In this case they do not even have that effect, for the evidence shows that the testatrix had had these habits and peculiarities in as great degree for many years, and there is nothing to indicate that they had their origin in a diseased mental condition.

The fact that she shuffled her feet as she walked after the operation on her leg in October, 1914, for varicose veins, showed physical disability, but it had no direct tendency to. prove mental disease or insanity. The attacks of aphasia and the difficulty in moving one hand, there being evidence of but one instance of the latter, show a considerable degree of senile deterioration. But these things do not of themselves establish the insanity that is essential to render a person incapable of making contracts or a will. "It is commonly held that aside from those cases of dementia where the patient has not mental power to form any conceptions whether true or false, of the relations of things, the true test of insanity is mental delusion; that if a person persistently believes supposed facts which have no real existence, and against all evidence and probability conducts himself upon the assumption of their existence, he is as to that belief under a morbid delusion, and delusion in that sense is insanity. But before a will can be rejected on that account it must appear that 'its dispository provisions were or might have been caused or affected by the delusion'; delusions which are not operative upon the testamentary act—do not relate to the persons or objects affected by it—are not permitted to invalidate it." (*Estate of Redfield*, 116 Cal. 637, [48 Pac. 794].)

In this case there is no pretense that the testatrix had not mental power to form reasonably accurate conceptions of the true relations of things. Her peculiarities and eccentricities do not constitute the degree of dementia referred to in the exception first noted in the passage just quoted. With respect to the true test there stated, the existence of delusions,

there is absolutely no evidence. It is obvious that the physicians who gave their opinions that she was of unsound mind were measuring it by a more exact and perfect standard than is required by the law: the mind wholly normal and healthy, free from any defective co-ordination arising from disease or decay. In a medical sense anything short of this may constitute insanity or unsoundness of mind; but the law does not demand such perfection to give capacity to manage one's affairs and make valid dispositions of property. The law defining insanity. which will avoid such an act requires "either insanity of such broad character as to establish mental incompetency generally, or some specific and narrower form of insanity, under which the testator is the victim of some hallucination or delusion." (*Estate of Chevallier,* 159 Cal. 161, 168, [113 Pac. 130].) And even in the latter class the act to be avoided must have been produced in whole or in part by the delusion or hallucination. (Ibid.)

At best, the testimony of expert witnesses as to insanity, based on hypothetical questions skillfully framed to call for an answer favorable to the party in whose behalf it is asked, "is evidence the weakest and most unsatisfactory." (*Estate of Dolbeer,* 149 Cal. 227, 243, [9 Ann. Cas. 795, 86 Pac. 695].) When, as in this case, the opinions as to unsoundness of mind, including those of the intimate acquaintances, are based on facts which show neither morbid delusion nor total mental incapacity, which prove nothing more than personal peculiarities and habits, accompanied by physical weakness, occasional lapses or failure of memory and defective nervous and muscular co-ordination, and it clearly appears that none of these frailties was present at the time of the execution of the will or affected its provisions in any way, the evidence is wholly insufficient to establish the fact.

The order is reversed.

Sloss, J., and Lawlor, J., concurred.

Hearing in Bank denied.

In denying a hearing in Bank the court filed the following opinion on April 16, 1917:

THE COURT.—In the opinion heretofore rendered the court in department held that the appellant, Woodhams, was

sufficiently interested in upholding the will of the deceased to maintain an appeal from the order in controversy, but inadvertently assumed that it was an order revoking the probate of the will, the fact being that it was an order refusing to admit the will to probate, and it was made upon a contest of the will before probate. The record on appeal was in typewriting as provided in section 953a of the Code of Civil Procedure, and neither party for the information of the court printed in their briefs the order appealed from, or any part of the pleadings in the case. (Code Civ. Proc., sec. 953c.)

The difference in the facts does not require a different ruling. Woodhams was named in the will as executor thereof and as such he filed a petition for the probate thereof, to which the respondent filed the contest. The code (Code Civ. Proc., sec. 1299), provides that any executor named in any will may petition the court to have the will proved. This clearly authorizes the executor to file and prosecute the petition to a final determination. An appeal may be taken from an order refusing to admit a will to probate. Having the authority and the right to file and prosecute the petition, he stands, with respect thereto, in a fiduciary relation to all the beneficiaries thereunder and it is his duty, and accordingly his right, to take all the proceedings necessary to secure a just determination of its validity, including an appeal from an adverse decision on the question. He has authority also, under section 369 of the Code of Civil Procedure, to sue without joining with him the persons for whose benefit the action is prosecuted. In this case he is interested because his position as the executor named in the will, and as the petitioner for its admission to probate, makes him the trustee for that purpose of the legatees named in the will. In that capacity, and by virtue of that right, he is a "party aggrieved" by the decision, and one who may appeal therefrom as provided in section 938 of the Code of Civil Procedure. There are no decisions by this court on the exact point, but the principle is everywhere recognized. (40 Cyc. 1229; 16 Ency. of Pl. & Pr. 997; 18 Cyc. 206; 3 Cor. Jur. 622.)

Petition for rehearing denied.