[Civ. No. 4597. Second Appellate District, Division Two.—May 16, 1924.]

# In the Matter of the Estate of MARY C. BABCOCK, Deceased.

[1] WILLS—CONTEST OF PROBATE OF—UNSOUNDNESS OF MIND OF TESTATRIX—DIRECTED VERDICT—EVIDENCE—RULE.—In a contest of the probate of a will upon the ground that the testatrix was not of sound mind at the time the instrument was executed, the rule is that if the evidence introduced is such that it would support a finding by the jury of lack of testamentary capacity, the direction by the trial judge to the jury to find that testamentary capacity existed is erroneous.

[2] ID.—EVIDENCE—DIRECTED VERDICT—ERROR.—In this contest of probate of a will upon the ground of the unsoundness of mind of the testatrix at the time she executed said will, there was substantial evidence to support the contest, with the result that the trial court erred in directing a verdict as he did in favor of testamentary capacity, and the question of the testatrix's competency should have gone to the jury.

(1) 40 Cyc., p. 1333.   (2) 40 Cyc., p. 1331.

APPEAL from an order of the Superior Court of Los Angeles County admitting will to probate. J. P. Wood, Judge. Reversed.

The facts are stated in the opinion of the court.

Marshall Stimson and Noel C. Edwards for Appellants.

Dailey S. Stafford for Respondent.

WORKS, J.—This is an appeal from an order admitting the will of Mary Catherine Babcock, executed September 28, 1917, to probate. Appellants, contestants in the trial court, opposed the probate of the will on the ground that the testatrix was not of sound mind at the time the instrument was executed. The contest was tried before a jury, but at the conclusion of the testimony on behalf of both the contestants and the proponent of the will the trial judge directed the jury to return a verdict that the

---

1. What constitutes capacity to make will, notes, 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444. See, also, 28 R. C. L. 85.

2. See 10 Cal. Jur. 1165; 26 R. C. L. 1065.

testatrix was not of unsound mind. Verdict was rendered accordingly and the order from which the appeal is taken was thereupon entered.

[1] Appellants make the contention that the court erred in directing the verdict which was returned. There is thus presented the question whether the record contains evidence of a substantial character tending to show that the deceased had not testamentary capacity at the time the will was made, for the rule is that such a direction is to be considered as if the judge had granted a motion for a nonsuit. Stated in other terms, the rule is that if the evidence introduced is such that it would support a finding by the jury of lack of testamentary capacity, the direction to find that testamentary capacity existed is erroneous. This rule is so firmly established that no citation of authority to support or illustrate it is necessary. A consideration of the question presented demands that we shall marshal the evidence upon the question of capacity which is most favorable to the contest, and upon that labor we shall now embark.

Mrs. Babcock was twice married, her second nuptial venture being with W. W. Babcock. This union occurred in 1899. Mrs. Babcock had no children by either marriage, but her second husband had a son, Eli Babcock, as the result of an earlier matrimonial alliance. At the time of her marriage with Babcock, the decedent owned a ten-acre orange grove near Pomona, in which town she and her husband resided until his death, which occurred in May, 1917, and in which she continued to live until January, 1922, when she was removed from her home for reasons below to be stated. The orange grove will be mentioned frequently in this opinion as the ranch. Mrs. Babcock conveyed this property to her husband in 1901. He conveyed to her a life estate in it in 1909 and the fee to an undivided half interest in it in 1915. The decedent made a will on September 15, 1911, which she never destroyed, although it was abrogated by the will of 1917, granting for the moment that the latter made valid testamentary disposition of her estate. The will of 1911 was found in Mrs. Babcock's Bible after her decease. The instrument recited the testator's age to be sixty-five, but the will of 1917 recited her age as sixty-nine, thus showing a discrepancy of two years. She died on March 15, 1922, at

the age, as stated in respondent's brief, of seventy-six. It is to be observed, as a circumstance to be considered in connection with other facts shown by the record, that the statement in the brief is probably in accord with the recital in the will of 1911, while it surely disagrees with that in the will of 1917, the assertion first made being somewhat affected by the question whether Mrs. Babcock's birthday occurred between September and March or between March and September.

The testimony concerning the mental condition of the testatrix relates to a period commencing as early as 1914 and extending to the day of her death. In relating the story told by the evidence which is favorable to contestants we shall be able, in some measure, to divide it under separate heads or subjects, observing, however, that some of it is not susceptible of that mode of treatment, while it will be noted, also, that in some instances the subjects overlap or merge into each other. In the fall of 1914, while visiting at the home of a nephew and his wife, Mrs. Babcock lay upon a couch next the wall and tore off pieces of the wallpaper. It was testified that she was "quite erratic" from 1915 forward. In 1916 she became unreasonably angry with her husband over small matters. One witness, a niece of decedent, relating occurrences between May and September, 1917, during which period she resided with decedent, said that she, the witness, would sometimes "get up in the middle of the night and I would find her [the testatrix] sitting in the front room, and I would say, 'Aunt Mary, what are you doing?' She would say, 'I am waiting for your Uncle Will to come home' [referring to her husband, who, it will be remembered, died in May, 1917]. I would say, 'Why, Uncle Will is dead.' She would say, 'No, he has gone to lodge.'" Speaking of occurrences at meal times and testifying as to the period mentioned, the same witness said "Sometimes I would come in, and she would have an extra plate set, and I would ask what it was for, and she would say, 'Your Uncle Will is coming in for supper.'" Mrs. Babcock visited at the home of a nephew in August, 1917. The nephew testified: "I went down town, and when I came back she asked me if I saw Uncle Bill down town; and I laughed at her, and thought she was just making a foolish remark, and . . . I says, 'Aunt Mary, Uncle

Will is dead.' 'Well,' she says, 'he is not dead.' And I changed the subject on to something else.'' The effect of the testimony of several witnesses is that Mrs. Babcock never went out alone after the death of her husband, as she was confused as to direction and location and lost herself. On one occasion in August, 1917, she went to the home of a grandniece, distant over forty miles from her own home, upon a visit which was to have been of a week's duration. She was driven to her destination by the husband of the grandniece. He testified: ''On the next morning, when I got up, she was getting ready, dressing. I says, 'Where are you going, Aunt Mary?' . . . She says, 'I am going home.' I says, 'You promised me to stay a week.' 'No,' she says, 'I am going home, because I have got some chickens there.' 'Well,' I says, 'I am not going to take you home to-day, because I am tired.' 'Well,' she says, 'I am going to walk if you don't, because it will not take me long.' So . . . after dinner I took the machine and took her home.'' In response to a question by the court the witness said further, ''She said she had a party there in charge of her chickens; . . . and I told her, I says, 'He is a good responsible man.' She says she was afraid he would steal her eggs.'' On an occasion in the summer of 1917 Mrs. Babcock, in company with the grandniece above mentioned, took a pair of shoes to a shoemaker to be mended and told him to deliver them to her home. The grandniece testified that she and the testatrix made three trips down town on that same day ''to tell the man about sending them up. . . . He told her he would send them up next day, but that didn't satisfy her. I had to go back with her about three different times to the same store.'' A witness testified that in October, 1917, Mrs. Babcock wound her clock three times in one day. When this action was called to her attention she said she did it because she didn't want the timepiece to run down and that ''she would wind her clock when she wanted to.'' A greatnephew of testatrix visited her for three days in the latter part of 1919 or early in 1920. One evening she invited him to go to a theater, saying that she had procured tickets for the performance. He accepted the invitation, but on reaching the theater found that she had no tickets and purchased tickets himself so that they might witness the performance. This same witness testified concerning

another matter which occurred during his visit with Mrs. Babcock: "We came home, and then after that she had a chicken for dinner, and the chicken, somehow or other she would cook just a little piece at a time, and never would put it on the table all at once; that is, we didn't have no chicken to amount to anything, you know. Q. How long did that take place? A. That took place the three days I was there. Q. You mean she was cooking the same chicken all the time? A. The same chicken all the time, yes, sir." He also testified that at about 8 or 9 o'clock of a morning during his visit Mrs. Babcock said she must clip the wings of her chickens to prevent them getting over the fence and away. He said the fence was so high that the chickens couldn't have gotten out, but she insisted on clipping their wings and that he held them while she did so. Later in the day she cut the wings of some of the chickens again, although he told her they had been cut already.

There is much testimony in the record as to the ability of the testatrix to recognize her relatives and other people and to keep them in mind. Early in 1915 a niece whom she had known intimately for many years made her a small present at Compton, California. Later in the same year Mrs. Babcock exhibited the present to the niece and stated that it had been sent to her from the east by a certain named person. In 1915, also, the testatrix mistook the husband of this niece, whom she had known well for several years, for a strange man. The pair were visiting the testatrix at the time. The niece testified: "We went up on Saturday; she invited us to go to Riverside, and on Sunday my husband was filling the radiator in her back yard, and she says, 'There is a strange man filling the radiator out of my faucet. I wish you would have him go down town and fill his radiator, because I am on a meter.'" Another niece testified that in 1917 relatives and friends "would come there and she didn't know them," and she said, more specifically, that in October of that year the male relative just mentioned in connection with the radiator incident of 1915 "came up, and she wanted to know what man that was." The husband of one of Mrs. Babcock's grandnieces testified thus of the testatrix in 1917: "Q. Were you present on the occasions when she failed to recognize your boys? A. Yes, sir; . . . she would ask my wife whose

boys they were; and when she come down to the house, she would ask us the same question. . . . Q. How many times do you suppose she saw those boys? A. Well, . . . once every month or so. Q. And how soon would it be after you had told her who the boys were before she would forget who they were? A. Why, it would not be very long. Sometimes she would get one mixed up with the other; and sometimes she would want to know where the boys came from. . . . Would not recognize them. . . . I saw it happen the same day. They would go out and come back in and she . . . could not tell one from the other. Q. Although you had told her who they were the very same day? A. Yes, sir. Q. Well, would it happen that she would not know that they were your boys . . . after you had told her they were the same day? A. Yes. Q. That happened frequently? A. Yes.'' The niece who resided with Mrs. Babcock from May to September, 1917, as already stated, was a grandmother, and Mrs. Babcock had great difficulty in remembering and recognizing her grandchildren. The niece testified: ''She would never know them. . . . About every three weeks, while I stayed with my aunt, my son-in-law and my daughter would come up with the boys and spend the day with me; about every three weeks they made me a visit. . . . She would not recognize the boys; she would always ask who they were all the time.'' The niece who was the wife of the man of the radiator incident testified that in May, 1917, at or near the time of Babcock's death, ''I went to her [Mrs. Babcock's] home, and she said, 'Where are you going to get your dinner?' I said, 'I am going to have dinner with you.' She said, 'I am not feeding strangers.' '' One of the witnesses, the wife of a grandnephew of Mrs. Babcock, whose first name was Arthur, had seen the testatrix two or three times a year for a dozen years prior to her death. Shortly after Babcock's death, on seeing the witness, the testatrix asked who she was. Upon being told that she was Arthur's wife, she asked, ''Who is Arthur?'' In 1918 Mrs. Babcock asked one of her nephews to pay her a visit. Three weeks or a month later he went to her house to accept the invitation. He testified: ''She did not recognize me when I first went there. . . . I told her who I was, and told her she asked me to come up, and I promised her I would.'' A greatniece of Mrs. Babcock was

married October 15, 1919, at the home of one of her great-nephews. The testatrix was present at the wedding and remained overnight at the house in which it occurred. On the morning after the wedding the bride came into the room where the testatrix and others were seated and gave a morning greeting. Mrs. Babcock, according to the bride, "turned and looked at me and says, 'Why, who are you?' Q. Did you tell her who you were? A. I did. Q. What did she say then? A. She didn't seem to say anything. She went on talking to my mother." There is other testimony in the record touching upon the conduct of the testatrix at the time of this wedding. The wife of the greatnephew at whose home the ceremony occurred testified: "My husband got his aunt, Mrs. Babcock, to come to the wedding. He went after her in a machine, he and his mother. . . . And when she came she did not seem to know who I was, and asked me the question and I told her. And so she asked his mother also who I was, and how many children she had, . . . Mrs. Babcock, my mother-in-law. And she told her. And the next morning, when she came down stairs, she asked again who I was, and I told her. And sitting at the breakfast table that morning she asked my husband's mother how many children she had again, and she repeated that again at least three times that morning to my remembrance. And then I took her home . . . in the machine and my mother-in-law went with me." When the witness and her mother-in-law started to return to the home of the former, the following occurred, according to the testimony of the witness: "She [the testatrix] says, 'Well, how are you going to get home?' I said, 'The same way we got out here.' 'Well,' she says, 'Who is going to drive your machine?' I says, 'I am.' 'Well,' she says, 'you did not drive it out here.' And she sat in the front seat with me going out. So she did not seem to remember that I had drove the machine; she didn't seem to know that."

The record also includes testimony relating to what may be termed Mrs. Babcock's sense of property at different periods, and relating to her familiarity with business and business methods. It is to be observed also, in passing, that some of the testimony already noted bears upon the question of her financial and property sense, although perhaps but slightly. The niece already mentioned as resid-

ing at Compton testified that Mrs. Babcock and her husband visited her in September, 1914. One night Babcock came to the room of the witness and rapped on her door. The witness followed him to the room occupied by himself and his wife. We now quote from the testimony: "Q. What was she [the testatrix] doing? A. She was lying on the floor. . . . She said they were trying to get her property away from her. . . . I coaxed her to go back to bed. I told her they wasn't trying to get her property away from her at all. . . . She said her husband was trying to influence her, to get the property away from her for his son. Q. Did she finally go to bed. A. She did." The niece who resided at Mrs. Babcock's home from May to September, 1917, testified to various occurrences of that period: "All times of the night I would wake up, and she would be at the dresser drawer, and she would pack and unpack . . . all the time, and go to her trunk and pack and unpack; and at other times I would find her in the bedroom and I would say, 'What are you doing?' She would say, 'I want something to eat.' And I would say, 'We don't keep the things in the bedroom.' . . . Q. Packed and unpacked what? A. Well, she would take things out of her dresser drawers, and she would take hairpins and she would tie them up with fine strings, and tie up little wads with threads. . . . She would place it back in the drawer; and then she would take out her clothes and put them back, and then she would go to her trunk and unpack." In the next house to that of Mrs. Babcock resided a worthy neighbor named Avery. During 1917 she said to various of her relatives, including the niece last mentioned, at different times, that this neighbor had stolen her husband's tools and that he continually knocked on the wall of her house. The niece testified, "at any time if there was a little noise at night she would say, 'Well, there is old man Avery around.'" One of the great-nephews of the testatrix, already mentioned, testified, "I had been out in the yard with her and she would say— the old man would be on the other side of the fence; she would say, 'Look at that old thief; he is trying to come over and get some more tools.'" The wife of the witness last mentioned testified, "She would tell me about him [Avery] knocking on the wall at night. . . . Q. What did she say about the tools. A. That Mr. Avery had stolen

her things, her tools.'' The niece who was with Mrs. Bab-
cock in 1917 testified that in that year and also in 1919
''she would shut off the gas on me when I was cooking
meals. In 1917 my sister's folks came up for dinner, and
I was getting the dinner, and I went in for something
and came back, and she had all my fires shut off.'' This
niece testified that during 1917, ''when they conserved
sugar, I would go down and buy sugar and she would hide
it and I never would find it. . . . She would hide soap and
food. . . . Sometimes she would hide them in the bedroom,
sometimes under the dresser, and in between her band-
boxes. . . . Q. What else would she hide besides sugar?
A. Cinnamon and lard. You would find a can of lard
hid in the closet. Q. When did you find a can of lard hid
in the closet? A. In 1917, two or three times.'' In Oc-
tober, 1917, Mrs. Babcock told a witness, ''I think that
Mr. Steadman is cheating me out of money.'' Mr. Stead-
man was a banker who will be mentioned below. The
niece who was with the testatrix in 1917 was also with her
for several months in 1919. She testified: ''Q. Did any-
thing unusual happen in the night-time during this visit?
A. Yes, one time I got angry about the packing and un-
packing, and I told her if she didn't quit it I would go
home, and she got up and laid on the floor for a couple
of hours. Q. Did she have anything over her? A. No.
Q. Did you try to make her go back in bed? A. Yes, but
she would not for a long time?'' We have already re-
lated certain occurrences in connection with a wedding
which took place on October 15, 1919, and have mentioned
the fact that Mrs. Babcock was driven home the next day
after the event. The witness who drove the car testified:
''On the way she said, 'I am going to give you some eggs
when I get home.' And so when we got there I said,
'Aunt Mary, are you going to give me those eggs?' And
she said, 'Yes.' And she had a big market basket that
would hold at least a peck of lovely big eggs, and she
went over to a small dish, where there wasn't eggs any
larger than a bird's egg, almost, and she picked out five
or six and put them in a great big bag, and she gave them
to me. 'Here,' she says, 'are your eggs.' . . . And also at
the house, the following morning at the wedding on the
16th, she says, 'I am going to give Mamie a nice wedding
present.' And she got her purse and she took out quite

a roll of bills; I should think there was nearly $200 in the roll; and she sat down in the kitchen at the table and counted the bills out; and I thought my sister was going to get quite a royal present; and she counted them all out and asked my mother-in-law for a rubber band to put around those bills; and she stuck them back in her purse.'' The proponent of the will introduced in evidence a large number of checks which had been signed by Mrs. Babcock. Steadman, the banker, already mentioned, testified that each of these checks was in his handwriting, except ,the signature. The banker also testified from the books of his bank that from May 23, 1917, to the time of the death of the testatrix the smallest balance she had on deposit in the institution was $1,231.67, that· having been the balance on the first-mentioned date. The largest balance during the period in question was $3,296.83 on January 29, 1918. Other balances on dates not far from the execution of the will were: July 12, 1917, $1,761; September 17, 1917, $2,105.79·; October 30, 1917, $1,930.15; December 19, 1917, $2,800; December 22, 1917, $1,800. Steadman testified that these balances did not draw interest, as the account was simply a commercial account. He then testified further: ''Q. Do you know why she kept so large a balance in cash that was not bearing interest. A. No; I have spoken to her at various times that she could cut down a little closer on the checking account if she wished, but she said it was always her wish to carry this much money on deposit, and I never questioned her further.''

Considering a special matter indicating the nature of Mrs. Babcock's property sense it will be remembered that as the result of conveyances mentioned early in this opinion she was the owner of an undivided one-half interest in the ranch and the owner of a life estate in the remaining half. She had a conversation with Eli Babcock a few days after her husband's death, in May, 1917, and she seems to have had a fairly correct understanding of the nature of her interest in the ranch at that time. Her stepson testified that she then said to him, ''I think everything is mine as long as I live.'' He remarked further that ''she said she thought father's part was left to her as long as she lived.'' There is evidence in the record, however, which tends to show that the same understanding was not present with

the testatrix at the time she executed the will, on September 28, 1917. The will was prepared by a lawyer and he talked with Mrs. Babcock about her property a few days before the instrument was drawn and executed. His testimony was: "Q. She told you what property she owned did she not? A. Yes, sir. Q. She told you that she owned the ranch? A. Yes. I asked her—I think my language was: 'What does your property consist of?' And she answered that question. Q. She said it consisted of the ranch and the home? A. Yes, sir, and the furniture and something in the bank in some form." A witness with whom Mrs. Babcock frequently advised concerning her affairs testified that she consulted him "late in 1917 or early in 1918" about a contract she was contemplating "with some young man in regard to taking the ranch." The young man was also present at the time. The witness further testified: "The proposition between the two was that he was to take the property—she was to sell the property to him and he was to pay for it out of the crops, care for it and pay for it out of the crops. And, after conferring, one with the other, they were not able to come to any definite agreement." In the latter part of January, 1918, the testatrix had a conversation with this same witness in which she told him that she owned the ranch in its entirety, showing him at the time her deeds from Babcock. The witness examined the deeds and explained to her the true state of her title in the property.

There are certain considerations concerning the two wills which, in connection with the other matters contained in the record, cast some light upon the question of Mrs. Babcock's mental condition at the time the second will was executed. We have already adverted to the apparent error made by the testatrix in the statement of her age in the second will and to the fact that the will of 1911 was preserved by her and was found in her Bible after her death, despite the fact that the later will had been executed. Further, in "the first part of October," 1917, and therefore but a few days after the will of that year was made, Mrs. Babcock had a conversation with one of her nephews, during which she exhibited to him the will of 1911 and called it a valuable paper. How this circumstance occurred is shown by the testimony of the nephew: "She made the remark that she was losing quite a little bit of

stuff from the house; that somebody was stealing, and so forth; and I asked her if she had any valuables lying around; and she says, 'I have got a few papers and some other little trinkets.' '' It was at this juncture that the testatrix produced the 1911 will as a valuable paper. The will of 1917 was drawn by Mrs. Babcock's counsel with the beginning, ''I, Mary Catherine Babcock,'' etc., but she signed it ''Mary Cat*hrin* Babccock.'' The signature to the will of 1911 was perfect in form. In addition to her husband, who was living at the time the will of 1911 was executed, Mrs. Babcock named in that instrument twenty-five persons as beneficiaries. In the will of 1917 she named as beneficiaries Eli Babcock and five other persons, L. S. Wilson, Myrtle Carrigan, Jessie Newmark, Henderson Heath and Laura Matney. There are several peculiar circumstances connected with these changes in the second will as compared with the first. By the 1911 will a one-twelfth part of the testatrix's estate was bequeathed to her husband, together with her household goods and chattels, while by the later instrument a one-fourth part of the estate went to Eli Babcock, her stepson. This apparent discrepancy might be explained by the fact that Mrs. Babcock had in the meantime acquired some estate from her husband, were it not that one witness testified that the testatrix said after Babcock's death that he left no estate. This statement, it is to be observed, accords strictly with her belief, above mentioned, that she owned the ranch in its entirety, as there is no showing in the record that Babcock possessed anything except his interest in that property. Other matters in connection with the 1917 will are worthy of note: Myrtle Carrigan was not mentioned in the instrument of 1911, the Jesse F. Newmark of that document becomes the Jessie Newmark of the later one, and the Henderson G. Heath of the first becomes the Henderson Heath of the second.

Several persons, ''intimate acquaintances'' of Mrs. Babcock as that term is used in subdivision 10 of section 1870 of the Code of Civil Procedure, were allowed by the trial court to testify as to her ''mental sanity,'' to employ the language of section 1870 or competency, or soundness of mind, at or near the time of the execution of the will of 1917, some expressing the opinion that she was competent, others that she was not. Upon the present appeal we are

of course interested only in the testimony to the effect that she was incompetent. The niece who lived with Mrs. Babcock from May to September, 1917, after stating the testimony which we have above ascribed to that witness, said that in August of that year the testatrix offered to give her the home in Pomona if she would continue to live with her. The niece refused the offer "because I didn't think she was competent to give it to me." She said further: "If she had been competent, I would have accepted it, but I didn't think she was competent to make any paper." The offer was again made a few weeks later, but was again refused for the same reason, as the witness testified. The husband of the grandniece to whom Mrs. Babcock had gone for a visit of a week, the visit being cut to one day, testified as to her condition in 1917: "My opinion would be that she was not capable of doing any business—any legal business; and her actions were—just like that time she come down, for instance to stay a week; she was going to start and walk home the next morning, forty some odd miles, and I had an awful time to get her to stay." One of the nephews of the testatrix testified that in 1917 she offered to give him and his brother her home if they "would go up there and take care of her," but that the offer was refused because "we did not think her competent to make any such contract." The witness testified further that he partially based his opinion as to her "unsoundness of mind" upon arguments she had with her husband before he passed away. He said, "they were unfounded; she had no right to make any argument with him whatever." He also said, "I was with her quite a bit, and I would not consider a person, the way she acted, as of sound mind." He testified further, that "in the latter part of 1917, after she become so totally deranged—that is, in my opinion, she used to telephone to my sister-in-law quite frequently to come after her, and she would not let her go back by herself; she would want to do it, and we were afraid that she would get killed. She would get lost, in fact." This same nephew testified that he saw Mrs. Babcock at his brother's home in September, October, or November, 1919, that her clothing was then filthy and that he regarded her as totally insane.

It is certain that during the last few months of her life Mrs. Babcock was insane in the fullest sense of the word. In

67 Cal. App.—21

January, 1922, she was taken to the psychopathic ward of the
county hospital where, after examination by a judge of the
superior court, she was placed in the care of a psychopathic
officer. This officer testified that she was then "disori-
ented and confused, and flighty, and sometimes quite dis-
turbed," that "she did not know whether she was in Los
Angeles, or whether she was in Pomona, or where she was.
Sometimes she thought she was in Pomona, and sometimes
she thought she was in Los Angeles; she could not tell.
. . . She talked in a rambling and incoherent way about
her people and her relatives and her circumstances, and her
condition, but she did not say anything that I took seri-
ously at all. Q. Her condition at that time—did you con-
sider her incompetent? A. Oh, yes." Upon the arrival
of Mrs. Babcock at the psychopathic ward she was exam-
ined by a specialist in nervous and mental diseases. He
testified that the testatrix then "showed evidence of
marked mental deterioration, and also physical. . . . She
was disoriented and confused, and didn't know where she
was. She thought she was in Pomona, and would think
that various people in the hospital were from Pomona.
She would constantly ask the same old questions over and
over again, and then seemed to forget that she had just
been answered. She didn't even know her way very well
about the wards. To my best recollection, she would not
know her own room. . . . Q. Did you make a diagnosis of
her trouble? A. Yes. Q. Did you form an opinion as to
the mental condition of this woman apart from the result
of the laboratory tests? A. Yes, sir. Q. Eliminate the
matter of the laboratory test. A. It is more confirmatory.
It was not the basis for the diagnosis. It simply assisted
in making the final diagnosis, that is all. Q. Will you state
your diagnosis, Doctor? A. General paresis. . . . Q. And
what in your opinion was the progress of the disease at
the time you observed her? A. She was in an advanced
stage of mental deterioration. There was no question as
to the insanity of the patient. There might have been some
question as to the diagnosis, as to whether it was general
paresis or senile dementia. That is the only question that
could arise, without the aid of the laboratory tests, if I
may be permitted to mention that again. She, as I stated
before, showed marked mental deterioration. That was
evident by the symptoms that I have mentioned here be-

fore. She did not know where she was, she did not know but that she was in Pomona; she made mistakes of identity; and I think she had some delusions of persecution. . . . Q. Doctor, what is the type of disease known as general paresis? A. Softening of the brain. Q. And is it a progressive disease? A. Oh, yes, it is a chronic, progressive disease; it is characterized by mental and physical deterioration. . . . Q. You would differentiate general paresis from other forms of insanity? In other words, this is not something that would come on suddenly? A. No. Q. What is the effect of general paresis or senile dementia upon the business ability of the person so afflicted? A. Why, it is—inasmuch as the judgment is disordered, necessarily they are incompetent to carry out a business transaction. . . . The Court: Doctor, limiting yourself to the information that you got by the observation and examination by yourself of the patient at the county hospital in 1922, . . . are you able at this time to express an opinion as to her mental competency in September of 1917? . . . A. . . . Well, in view of the fact that there was a very marked mental deterioration, I am of the opinion that it had taken a long time, years, for it to have progressed to the degree that it was in when I saw the patient; a number of years; . . . how many, of course, I am unable to say. . . . The Court: I will ask you the question whether you are able to express an opinion from the examination and observation that you made in 1922 . . . as to whether or not she was competent in September, 1917? A. My opinion is that she was not.'' From the psychopathic ward Mrs. Babcock was sent to a home for the treatment of insane persons where she died March 15, 1922.

The rules of law governing the settlement of such questions as the one here presented are well established by a number of cases, among which are *Estate of Huston,* 163 Cal. 166 [124 Pac. 852], *Estate of Purcell,* 164 Cal. 300 [128 Pac. 932], *Estate of Collins,* 174 Cal. 663 [164 Pac. 1110], *Estate of Allen,* 177 Cal. 668 [171 Pac. 686], and *Estate of Hess,* 183 Cal. 589 [192 Pac. 35]. We need not pause to quote from the opinions rendered in those cases, but we have endeavored, in our full and circumstantial statement of the evidence which is favorable to the claim of appellants, to so segregate the evidence as to lay ground for the ready application of the different principles of law

enunciated by them. The testimony of two experts, one a phychopathic officer, so called, and the other a skilled specialist in mental diseases, given pursuant to an examination of the patient and not upon hypothetical questions, shows that she was insane in January, 1922. The specialist testified, again not in answer to a hypothetical question, but upon a personal examination followed by a laboratory test, that the testatrix was suffering at that time from the progressive mental disease known as general paresis. There being evidence in the record upon these points the contest resolves itself into a question whether the disease had so fastened itself upon Mrs. Babcock in September, 1917, four years and five months before she was confined in the psychopathic ward, hopelessly insane, that she was then incompetent to make a will. Upon this exact question the specialist, again basing his answer upon a personal examination and a laboratory test and not upon a hypothetical question, expressed the opinion that the testatrix was incompetent at the time she put her hand to the contested will. Upon this exact question there is also the mass of evidence, some parts of it weak, some parts of it relatively strong, which we have set forth above at such length. [2] Upon the whole record, we are satisfied that there was substantial evidence to support the contest, that the trial judge erred in directing a verdict as he did, and that the question of Mrs. Babcock's competency should have gone to the jury.

Order reversed.

Finlayson, P. J., and Craig, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 14, 1924.

Seawell, J., and Sturtevant, J., *pro tem.,* dissented.