[Civ. No. 4445.  Second Appellate District, Division One.—May 28, 1925.]

WARREN K. ROLLINS, Special Administrator, etc., Respondent, v. AUSTIN SMITH et al., Appellants.

[1] ESTATES OF DECEASED PERSONS — ASSIGNMENTS BY DECEASED — MENTAL INCOMPETENCY—INSANE DELUSIONS—EVIDENCE.—In this action by an administrator to set aside certain assignments of certificates of stock and mortgages made by the deceased to his daughter shortly prior to his death, upon the ground that the de-

---

1. What are insane delusions and effect on competency, note, 63 Am. St. Rep. 80.

ceased was of unsound mind at the date of said assignments, although the evidence showed that at times the deceased (who had been an attorney) appeared to be laboring under the delusion or hallucination that he was holding court, such proof was not evidence of his mental incompetency to make the assignments in question, where such delusion had no reference to or connection with the disposition of his property, or to his daughter to whom his property was conveyed, or to any of his other children who were excluded from this property.

[2] Id.—Physical Disability—Mental Incompetency—Evidence.— Proof that a person old and infirm was at times unable to recognize his friends, that he was unable to transact his regular business, that his habits were filthy, that he was irritable and ill-tempered, and that his mind was weak and failing, does not establish as a fact that his mental incompetency was such that he could not dispose of his property, especially when the evidence further shows that he often did recognize his old friends and new ones also, greeting them and calling them by name, that he engaged in intellectual conversations with them, that up to a month prior to his death he went to his office regularly and found his way without assistance through the streets of a crowded city, and that in executing one of the transfers sought to be set aside he examined it critically before executing it, stating that he wanted to be sure it was correct, and after signing it he expressed regret that he had not signed his name on the line provided for that purpose, and he remarked that his name was not well written.

[3] Id.—Senile Dementia—Capacity to Execute Contracts.—Senile dementia does not constitute the sort of incompetency or insanity which, in the estimation of law and of men of ordinary sagacity and prudence, renders a person incapable of executing contracts or making a will.

[4] Id.—Undue Influence—Susceptibility of Deceased—Evidence.— In this action by an administrator to set aside certain assignments of certificates of stock and mortgages made by the deceased to his daughter shortly prior to his death, upon the ground that said assignments were procured by the exercise of undue influence, while the evidence showed that, at the date the assignments were executed, the deceased was weak in mind and body and therefore much more susceptible to the influence of others than he would have been had he been a strong and vigorous person, there was no evidence whatever that said daughter or her husband, or any other person in their behalf, ever exercised or attempted to exercise any influence over the deceased to execute the assignments conveying to said daughter about one-half of his property.

---

(1) 5 C. J., p. 939, n. 85.    (2) 5 C. J., p. 939, n. 85; 32 C. J., p. 622, n. 63, 67; 40 Cyc., p. 1024, n. 34, 38, p. 1031, n. 93.    (3) 5 C. J., p. 939, n. 85; 32 C. J., p. 787, n. 97.    (4) 5 C. J., p. 940, n. 1.

APPEAL from a judgment of the Superior Court of Los-Angeles County.  J. P. Wood, Judge.  Reversed.

The facts are stated in the opinion of the court.

Clyde R. Burr and W. W. Hyams for Appellants.

James S. Bennett for Respondent.

CURTIS, J.—Henry S. Rollins was for a number of years a practicing attorney in the city of Los Angeles.  Some years prior to his death he became estranged from his wife, and this estrangement resulted in a legal separation of the parties.  They had four children, one son and three daughters.  These children were all living at the time of his death.  Probably as a result of the differences between himself and wife, the relations between him and three of his children were not of the most cordial character during the latter years of his lifetime.  His daughter, Florence Rollins Smith, one of the defendants, remained friendly to him during the domestic disturbances in his family, and these friendly relations continued up to the time of his death.  He visited her and her family frequently, and in turn she called to see him regularly at his office.  After his separation from his wife he did not live with any member of his family.  For about four years immediately prior to his death, with the exception of the last month of his life, he had his lodgings in the rooming-house of Mr. and Mrs. Odell, in the city of Los Angeles.  He also took some of his meals with the Odells.  On March 21, 1921, at the request of Mr. Odell, Mrs. Smith, deceased's daughter, removed him from the Odell house to the county hospital.  This was done on account of the enfeebled condition of his mind and body, which rendered him almost helpless and in need of constant care and attention.  On account of the crowded condition of the county hospital he was placed in its psychopathic ward, and a few days later, at the suggestion of the hospital authorities, Mrs. Smith swore to a complaint in insanity against him, and a hearing was had on this complaint on March 28, 1921.  This hearing resulted in him being sent to the Glendale Sanitarium, under the immediate care of Jean G. McCracken, the psychopathic parole officer of said county.  No judgment or

order was made by the court upon the question of his sanity, but the proceedings were simply continued indefinitely and after his death they were dismissed. One of the reasons, and, as we gather from the record, probably the main reason, why he was sent to the Glendale Sanitarium and was not committed to a public institution, was the fact, which developed at the hearing, that he was possessed of property sufficient at least to provide him with the care and attention his condition required, at some private hospital or sanitarium. It does not clearly appear just what property he was shown to possess at that hearing, but the evidence there produced showed that he was the owner at least of a house and lot situated in said city which had been his home on some previous occasion. As far as we are able to gather from the record, it was not shown at that time that he was the owner of any other property. It afterward developed that he was then and for some time had been the owner of fifteen shares of the capital stock of the Union Oil Company, 5,000 shares of the capital stock of the United Oil Company and two mortgages, one for $5,500 and the other for $2,000, besides the real property above mentioned and other real and personal property. The whole property was of the value of about $30,000. The fact that he possessed this property was not theretofore known by his daughter Florence, or her husband, the defendants herein, or any other member of his family, and by but few, if any, of his near friends.

He was taken to the sanitarium at Glendale on the twenty-eighth day of March, 1921. His daughter, Mrs. Smith, visited him at the hospital, probably the next day after he was taken there, and thereafter on practically every day until the day of his death. No other member of his family visited him while he was at the hospital. On the 31st of this same month, according to the testimony of Mrs. Smith, he stated to her that he realized that he was a very sick man and asked her to stop at his office on her way back to her home and get his mail, also his private papers. He gave her directions where these papers might be found and asked her to bring them out with her the next day she came to see him. On the following day Mrs. Smith brought him the papers, and after he had received them he executed and delivered to her assignments of the fifteen shares of stock

of the Union Oil Company and the 5,000 shares of stock of the United Oil Company, and gave her a check for the amount of his bank account, which was something over $700. On the night of April 9, 1921, he executed, acknowledged and delivered to her an assignment of the $5,500 mortgage and on the 14th of the same month he executed and on the 16th he acknowledged an assignment of the $2,000 mortgage. Two days thereafter he died at the hospital.

This action was instituted by plaintiff as the special administrator of the estate of Henry S. Rollins, deceased, against Florence Rollins Smith and her husband, Austin Smith, to set aside the assignments of said certificates of stock and said mortgages, upon the ground that the said Henry S. Rollins was of unsound mind at the date of said assignments and upon the further ground that said assignments were procured from said deceased by the exercise of undue influence over said deceased by the defendants at the time of the execution of said assignments. The court found in favor of the plaintiff upon both of these grounds and rendered judgment setting aside said assignments and directing the defendants to deliver to plaintiff the certificates of stock and said two mortgages. The defendants have appealed from this judgment, and as a ground of appeal contend that the evidence is not sufficient to justify the findings of the court that the said Rollins was mentally incompetent to make said assignments, or that defendants exercised undue influence over the said Henry S. Rollins, and as a result of said undue influence said Henry S. Rollins executed said assignments.

The evidence on behalf of respondent in support of the findings of the court that deceased was of unsound mind at the time he executed the various assignments in favor of the defendant Florence Rollins Smith is substantially as follows: Deceased was at the time of his death between sixty-one and sixty-two years of age. About a year and a half to two years prior thereto he became careless about his personal appearance and condition of his person and clothing; he became weak in body and walked with tottering steps, and later on, and up to the time of his death, he walked with his body in a stooped position, shuffling his feet along and dragging one foot after the other. About a year before his death he lost to some extent control of his bowels

and urine. He was unable at times to feed himself and had to be assisted by others at his meals. He became irritable and swore at his food and at his fork when he was unable to properly handle it. He was unable to control his saliva and the same ran from his mouth down upon the table so that he was forced to eat his meals alone. He either was not able or had not the inclination to undress himself on going to bed at night, and if no one volunteered to assist him he retired with his clothes on and the next morning his clothes and person would be found in a filthy condition as a result of his inability to control his bowels and urine. He was unable to cleanse himself and had to be bathed by others. His condition was progressive, and about one month before his death the Odells, with whom he was living, were forced to request the defendant Florence Rollins Smith to remove him from the Odell home to some place where he could receive the care and attention his enfeebled condition required. Some months before his death his speech became affected and he articulated with difficulty, so that it was hard to understand him in conversation. This defect in his speech appeared to be caused by the thickening and hardening of his tongue. After being taken to the Glendale Sanitarium he often was unable to recognize his old friends. On the other hand, he quite frequently recognized them and engaged in conversation with them and those in charge of the hospital. Mr. Odell called to see him on four different occasions. On the first two he failed to recognize Mr. Odell, but on the other two he knew him.

Mrs. Anderson, the proprietor of the Glendale Sanitarium, a witness in behalf of respondent, testified that she cared for him the first few days he was in her hospital and that "he always knew me when I would go in, he would always say, 'Good morning, Mrs. Anderson,' and call my name, and he told me two mornings what he wanted, things to eat, for the next meal. I fed him his breakfast the first two mornings he was in the hospital. The third morning he ate himself. After the second morning he fed himself as long as he remained in the ward." He was removed from the ward to a room on April 8th. This witness also related a conversation had with deceased, when he talked with her about her little girl and about the flowers the latter had with her. She also detailed a conversation, had with him after

he came to her hospital, regarding some chocolate that she had made for him, in which he expressed himself as liking the chocolate very much and wishing that she might give the recipe for making it to his daughter, Mrs. Smith.

At times, while at the Glendale Sanitarium, he appeared to be holding court and was greatly angered at any noise which interrupted the proceedings. Up to a month before his death he went to his law office regularly in the city of Los Angeles, and found his way unassisted through the crowded streets. He had not, however, been able to transact any legal business for a year or more before his death. He was not able even to fill out notary papers on one occasion when a former client called for that purpose. He spent much of his time at his office lying down on an old couch in a rear room.

Mr. Emery, a witness for respondent, who took the acknowledgment of the deceased to the assignment of the Hahn mortgage on April 9th, testified in behalf of plaintiff that "The first thing, as near as I can recollect, that Mr. Rollins said was to request all persons except Mr. Smith and myself to leave the room. . . . He remarked to me that his signature was pretty bad. As near as I can remember the conversation that he had, he remarked that his name was not written very well and he was anxious that it be on the line. . . . He looked the paper over he had it in his hand, and before he signed it he looked it over, and I don't remember the exact remark, but something, that he wanted to be sure it was correctly drawn; and then Mr. Smith told me that Mr. Rollins was careful because he had been an attorney. . . . I did not know anyone connected with the transaction prior to that time." This witness also stated that he observed nothing out of the way or unusual in Mr. Rollins more than that there seemed to be a slight impediment in his speech, but that he had no real difficulty in understanding him.

Two physicians testified at the trial. One of these physicians had examined him at the time of the hearing upon the insanity charge. Each of these physicians gave as his opinion that the deceased, for months prior to his death, had been suffering from senile dementia.

[1] This evidence brings this case squarely within the rule laid down in the cases of *In re Redfield,* 116 Cal. 637

[48 Pac. 794]; *Estate of Chevallier,* 159 Cal. 161 [113 Pac. 130]; *Estate of Purcell,* 164 Cal. 300 [128 Pac. 932]; *Estate of Collins,* 174 Cal. 663 [164 Pac. 1110]; *Estate of Perkins,* 195 Cal. 699 [235 Pac. 45]. This rule is fairly and correctly stated as follows: "In considering the evidence it is important, preliminarily, to observe that it is not every form of insanity, not every mental departure from the normal which destroys an otherwise valid testamentary act. The rule of law is not that no person who is insane may make a valid will, but that the will of no person who, by reason of insanity, is incapable of making valid testamentary disposition shall be upheld. Thus, the wills of aged and infirm people, of people sick in mind as well as in body, are always upheld, if, notwithstanding their enfeeblement, testamentary capacity is shown. So, again, it may be well and perhaps soundly reasoned that all persons who commit crime and that all persons who commit suicide are aberrant, abnormal, and therefore insane. But such is not the insanity which the law has in mind. It must be an insanity of one of two forms, either insanity of such broad character as to establish mental incompetency generally, or some specific and narrower form of insanity, under which the testator is the victim of some hallucination or delusion. And, even in the latter class of cases, it would not be sufficient merely to establish that a testator was the victim of some hallucination or delusion to avoid the will. The evidence must go further and establish that the will itself was the creature or product of such hallucination or delusion, or, in other words, that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument. It would thus not be sufficient, to avoid a will, to show that the testator believed that the moon was made of green cheese, but if it should be established, in addition thereto, that because of this belief he devised or bequeathed his property in a way which, saving for the belief, he would not have done, a case is presented where the abnormality of mind has a direct influence upon the testamentary act." (*Estate of Chevallier, supra,* page 168.)

In the very recent case of *Estate of Perkins, supra,* the same rule is stated in the following language: "Mental derangement sufficient to invalidate a will must be insanity in one of two forms: (1) insanity of such broad character as

to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion. Even in the latter class of cases, it is not sufficient merely to establish that a testator was the victim of some hallucination or delusion. The evidence must establish that the will itself was the creature or product of such hallucination or delusion; that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument. The evidence must establish, in addition to the fact of the existence of the hallucinations or delusions, the fact that by reason of these hallucinations or delusions the testatrix devised or bequeathed her property in a way which, except for the existence of such delusions, she would not have done. In short, the abnormality of mind must have had a direct influence upon the testamentary act.''

Measuring the above facts set forth in this case by the rule laid down by the supreme court in these decisions, they come far short of establishing in a legal sense the unsoundness of the mind of the said Rollins at any of the several dates when the assignments were executed. The only delusion or hallucination under which the deceased was laboring, as shown by this evidence, was that at times he appeared to act as if he were holding court, but this delusion had absolutely no reference to or connection with the disposition of his property, or to his daughter Mrs. Smith, to whom his property was conveyed, or to any of his other children who were excluded from this property. There is no ground for contending that the assignments of stock and mortgages were the creatures of this delusion, or that such assignments were the direct result of, or that they were in any manner prompted, suggested, or influenced by said delusions. That being true, proof that the deceased was suffering from such delusions would not be any evidence of his mental incompetency to make said assignments.

[2] While this evidence shows that deceased for some months immediately prior to his death was weak in mind and body, it is wholly insufficient to prove ''insanity of such a broad character as to establish mental incompetency generally.'' Proof that a person old and infirm was at times

unable to recognize his friends; that he was unable to transact his regular business; that his habits were filthy; that he was irritable and ill-tempered, and that in other ways, as shown by the above evidence in this case, his mind was weak and failing, does not establish as a fact that his mental incompetency was such that he could not make a will or otherwise dispose of his property. Especially is this true when the evidence further shows that he often did recognize his old friends and new ones also, greeting them and calling them by name, and engaged in intelligent conversations with them; that up to a month prior to his death he went to his office regularly, and found his way without assistance through the streets of a crowded city, and that in executing one of the assignments, which it was sought to have set aside, he examined it critically before executing it, stating that he wanted to be sure it was correct, and that after signing it he expressed regret that he had not signed his name on the line provided for that purpose, and remarked that his name was not written very well. "The amount of intelligence requisite for a man to know what he wants to do with his property, or to understand satisfactorily the state of his family and his affairs, is not great. Such an amount of knowledge is presumably not inconsistent with the existence of great feebleness of mind, considerable loss of memory, and even with some insane delusions. In old age all these conditions may exist, and yet a man may know enough, in the eyes of the law, to be able to make a will." (1 Wharton and Stille's Medical Jurisprudence, vol. 1, sec. 991.) "Extreme stinginess, repulsive or filthy personal habits, ill temper, jealousy, a dictatorial and disagreeable disposition, and a propensity to drive hard bargains, do not constitute insanity or unsoundness of mind." (*Estate of Collins, supra,* p. 669).

[3] It is true that the two physicians who testified in favor of the respondent testified that the deceased was suffering from senile dementia for some months prior to his death, and during the period when the assignments were executed, but it is the well-settled law of this state that persons so afflicted are not invariably rendered incapable of executing conveyances of their property and of transacting business. "The medical profession may describe such a con-

dition as senile dementia and declare such a person mentally
unsound, but it does not constitute the sort of incompetency
or insanity which, in the estimation of law and of men of
ordinary sagacity and prudence, renders a person incapable
of executing contracts or making a will.'' (*Estate of Pur-
cell, supra,* p. 306.) It is our conclusion, therefore, that
the evidence is insufficient to justify the finding of unsound-
ness of mind.

[4] As to the finding that the assignments were the
result of undue influence exercised by the appellants over
the deceased, the evidence in the case is even less satisfying.
While the deceased was, at the date the assignments were
executed, weak in mind and body and therefore much more
susceptible to the influence of others than he would have
been had he been a strong and vigorous person, yet we find
no evidence whatever that the appellants, or either of them,
or any person in their behalf, ever exercised or attempted
to exercise any influence over him to induce him to execute
the assignments. He did not convey to Mrs. Smith all of
his property by the assignments he executed in her favor,
only about one-half. The court found the Union Oil stock
to be worth $2,370 and the United Oil stock $4,200. Assum-
ing that the mortgages were worth their face, and that the
bank deposit was $700, the amount of property conveyed by
the deceased to Mrs. Smith was $14,770. He had fre-
quently said prior to his death that he intended that Mrs.
Smith should have a larger portion of his property than his
other children, for the reason that she was the only one of
his children who remained friendly to him. The evidence
fails to show that any of his other children had called upon
him or manifested any interest in him for at least four
years prior to his death. None of his children, with the ex-
ception of Mrs. Smith, even attended his funeral, although
they were all living in the city of Los Angeles at the time
of his death. Under these conditions it is not strange nor
unusual that he should make a preference in favor of Mrs.
Smith over his other children in the final disposition of his
property. He evidently intended to make a will, as on one
occasion while at the Glendale Hospital he stated that Mr.
Lewis, an attorney with whom he had been associated in
some legal matters, would be out on the following day to
draw his will. Mr. Lewis was at the hospital the next day,

which was Sunday, April 3d, and Mr. Rollins said to him, "I wanted you to attend to making my will, but I don't want to make it up now, there are too many people around here." It does not appear that any further reference was ever made by him to the making of his will. He died intestate and the property belonging to his estate, the value of which was in the neighborhood of $15,000, exclusive of that conveyed to Mrs. Smith, would go equally to all his children. Respondent has called to our attention the case of *Weakley* v. *Mellon,* 189 Cal. 44 [207 Pac. 523], where the court, without any showing that all of the property of the plaintiff was involved, sustained a judgment setting aside a conveyance to her son upon the ground of undue influence, and claims that the present action falls within the rule declared therein. The facts of that case, however, are entirely different from those in the present action. In that case, the son repeatedly urged the mother to make the conveyance in his favor. Upon her refusal to comply with the request he patted his mother on the shoulder, and said, "It's all right, Mother, it is just to keep Pearl from making any trouble or getting it after you are through with it." The trial court found that the mother, in an extremely agitated and nervous condition, and through the exercise of undue influence over her by her son, executed the conveyance, and the supreme court sustained the judgment. While there was no proof that the property involved in said action was all of the property of the mother, there was positive and convincing testimony that the son had exercised undue influence over his mother, and that the conveyance made by her was the result of such undue influence. This case was decided not upon the theory that undue influence would be presumed from the confidential relations existing between the mother and her son, but upon direct evidence that such undue influence had been exercised by the son over the mother, and that she was thereby induced to execute the conveyance. In the present case we have no such direct evidence. In fact we have no evidence whatever that defendants unduly persuaded Rollins to transfer the stock and mortgages to Mrs. Smith. The only evidence in the case that either of the defendants ever requested Rollins to execute any of the assignments is that given by Mrs. Burger, the nurse, who testified

that Mr. Smith said to Mr. Rollins on the occasion when Mr. Smith brought to Mr. Rollins for his signature an assignment of mortgage, probably the Berg mortgage, "Now, Grandpa, I want you to sign this." In attempting to sign the instrument, however, Mr. Rollins apparently failed to properly sign his name and Mr. Smith said, "Oh, you have spoiled it. I will have to make another copy." The attempt to obtain his signature was thereupon abandoned for the time. This was on April 11th or 12th. The assignment of the Berg mortgage was signed on April 14th. Mrs. Burger was not present when this assignment was executed. She was present two days later when Rollins' acknowledgment was taken to this assignment by the notary Bryant. But even conceding that Rollins signed any of the instruments only after Smith had stated to him that he wanted him to sign it, yet there is no evidence that Smith did any more than make this request, or that he accompanied his request with any efforts of compulsion. We think there was an utter lack of proof of any pressure brought to bear upon Rollins by the defendants, or either of them, which overpowered the mind of the latter and overcame his will at the time he executed the assignments or any of them. Unless the proof amounts to this, it is absolutely insufficient to show undue influence. (*Estate of Ricks,* 160 Cal. 450, 462 [117 Pac. 532]; *Estate of Perkins, supra,* p. 374.) "The presumption of undue influence is not raised by proof of interest and opportunity alone. In order to set aside a will for undue influence, there must be substantial proof of a pressure which overpowered the volition of the testator at the time the will was made. In order to establish that a will has been executed under undue influence, it is necessary to show, not only that such undue influence has been exercised, but also that it has produced an effect upon the mind of the testator by which the will which he executes is not the expression of his own desires." (*Estate of Nelson,* 132 Cal. 182, 194 [64 Pac. 294, 299].)

The evidence being insufficient to justify the findings of the court, either that Rollins was incompetent at the time of his execution of the four assignments in favor of Mrs. Smith, or that said assignments were executed by reason of

undue influence, the judgment should be reversed, and it is so ordered.

Conrey, P. J., and Houser, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on June 15, 1925, and respondent's petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 27, 1925.

Myers, C. J., and Richards, J., dissented from the order denying a hearing by the supreme court; and Houser, J., *pro tem.,* did not participate.