Opinion
 

 ASHBY, J.
 

 Plaintiff and respondent Board of Regents of the State Universities of Wisconsin brought this action against defendant and appellant estate of Ralph E. Davis, Sr., deceased, to recover money due under a pledge agreement made by decedent during his lifetime. Defendant estate appeals from a judgment on a jury verdict in favor of plaintiff.
 

 On January 6, 1968, decedent, then 83 years old, participated in a fund drive by Wisconsin State University-Platteville to raise money for a football stadium, by pledging to match funds raised from other sources up to a total of $150,000. Unknown to the university, a California court in October 1967 had appointed a panel of conservators to manage decedent’s property. (See Prob. Code, § 1751.) The conservatorship was established without a finding that decedent was either insane or incompetent. On a prior appeal in this case, from a judgment on the pleadings in favor- of-defendant, our Supreme Court held that a conservatee in such circumstances retains a limited power to contract, and that therefore the mere existence of a conservatorship did not itself deprive decedent of the capacity to enter into the pledge agreement.
 
 (Board of Regents
 
 v.
 
 Davis,
 
 14 Cal.3d 33 [120 Cal.Rptr. 407, 533 P.2d 1047].) The court pointed out that under Probate Code section 1858 the conservator is required to pay debts incurred by the conservatee during the conservatorship if they appear to be such as a reasonably prudent
 
 *866
 
 person might incur. The court also stated that the conservator would, of course, retain the power to void or rescind contracts of the conservatee on the basis of traditional defenses including incapacity or fraud.
 
 (Id.,
 
 at p. 41 & fn. 13.) This trial followed.
 

 At the time of the pledge the school was known as Wisconsin State University-Platteville. The school traced its history to a “Normal School” founded in 1866 at Platteville. In 1907 a mining school was established there, and decedent was the director and a teacher at the mining school from 1910 to 1920. Under decedent’s direction, the mining school established a high reputation. Subsequently decedent became a highly paid consultant evaluating properties for the oil and gas industry and was chairman of a firm, Ralph E. Davis and Associates, with 20 employees. He acquired considerable wealth and during his lifetime made gifts to his four children, each in the range of $750,000 to $1 million and to his 11 grandchildren, each in the range of $100,000. In 1961 decedent was honored by the University of Wisconsin at Madison as one of its most outstanding engineering graduates. After the death of his wife in 1962, decedent donated $25,000 to the University of Wisconsin Medical School for research.
 

 In 1966 decedent was honored by WSU-Platteville at a celebration of the school’s 100th anniversary. He was overcome at the great honor and obviously pleased.
 

 The football field at WSU-Platteville was a “cow pasture” with seating for only 2,000. A fund drive was initiated to raise money for a new football stadium. The board of regents would not approve state funding for the stadium. On the condition that $150,000 first be raised from private or local sources, the board would authorize a bond to finance the remainder of the cost, which would be amortized over 30 years and repaid by student fees. Any private contributions thus reduced the student loan. It was estimated the stadium would cost $500,000. As an incentive the school was willing to name the stadium for anyone who gave $100,000 or more.
 

 In November 1967, Roy Kopp, a Platteville attorney who was a member of the board of regents and a friend of the Davis family, visited the decedent in Houston, Texas. He discussed with decedent certain plans which were being made to tear down the building which had housed the old mining school. Decedent said, “If I can help it I will never let them tear that building down, and I’ll certainly help in any way
 
 *867
 
 I can to prevent that.” Kopp replied that there were still negotiations to have the City of Platteville take over the building as an historical monument, but he would keep in touch with decedent. Kopp then mentioned that money was being raised for a football stadium. Decedent said he was very much interested in athletics and wanted to know about the stadium. After hearing about it, decedent said, “Roy, I’m going to help you with both projects.” A few days later decedent told Kopp that he had decided what he would do, and asked Kopp to arrange a dinner with other possible contributors and “I will announce then what I will do and to stimulate your efforts and help you raise the money you need.”
 

 The dinner was arranged for January 6, 1968, in Platteville. Decedent arrived the night before and spent the day with Kopp, Dr. Bjame Ullsvik, president of the school, and other friends. Neither Kopp nor Ullsvik found any reason to be concerned as to decedent’s mental capacity, and in fact they were quite impressed with his apparent vigor and good health for a man of his age. Decedent exhibited a remarkable memory, and did not indicate any confusion in his train of thought. They had no knowledge of a conservatorship.
 

 During the afternoon prior to the dinner, Dr. Ullsvik told decedent, “Now, Mr. Davis, we have sent a brochure out, and in that brochure that we have said that if the stadium would be named after anybody we would like to have a hundred thousand dollars before we start making recommendations ... I don’t know whether you are interested in having the stadium named after you.” Decedent said, “Well, I certainly am. If I want to have it named, I want to have it named The Ralph E. Davis Stadium, my son [Ralph E. Davis, Jr.] will also receive honor in it.” Ullsvik said, “Well, now a hundred thousand dollars,” and decedent said, “I’ll do that and more.” Shortly before the dinner, decedent disclosed to Kopp and Ullsvik his surprise, “I am going to announce tonight that I will match gifts that you have already received and gifts that you receive in the future as a result of my speech, which I hope will be helpful to you up to a total of $150,000.” At the dinner decedent announced “that he would match all of the funds that we had raised to date and that we were able to raise in the future, as those funds were paid in, pledges being reduced to cash, as reduced to cash, he would match them up to a total of $150,000.”
 

 After the dinner, at Dr. Ullsvik’s home, decedent said he would be glad to put the pledge in writing. Dr. Ullsvik typed a pledge and decedent signed it. It reads: “January 6, 1968.1, Ralph E. Davis, desire to
 
 *868
 
 participate in the program for financing the projected stadium for Wisconsin State University, Platteville. I hereby agree to match funds raised from other sources up to a total of $150,000 payable quarterly as other funds have been collected. [Signed] Ralph E. Davis.”
 

 The conservatorship, and subsequently the estate (decedent having died in September 1968), refused to honor the pledge.
 

 At trial the total contributions to date from community and private sources were established to be $104,938.90. The jury awarded plaintiff this amount plus interest of $38,902.28, for a total of $143,841.18.
 

 Defense
 

 Decedent’s adult children noticed a gradual deterioration in his physical condition and mental alertness after 1962. He gradually became both forgetful and obstreperous. In 1965 he became interested in investing in mining ventures involving mercury, gold and silver. Over the course of the next two years, decedent invested or committed himself to invest approximately $2 million in a number of mines. The cash for these investments was obtained largely through partial liquidations of decedent’s multimillion dollar holdings in Texas Gulf Sulphur stock. Decedent did not use sound mining practices in evaluating these mines prior to his investing in them. According to the expert who was subsequently hired by the conservatorship to evaluate the mines, virtually none of them was economically viable, and they were managed by promoters who were not legitimate industry people.
 

 When cautioned by his son, Ralph Davis, Jr., and his attorney, about these investments, decedent insisted that he knew better than they and that the mines were good investments. Decedent made statements that he had made $20 million in two or three years on these investments. He also stated, contrary to the advice of his attorney, that his commitments were not binding and he could get out of them anytime he wanted.
 

 In 1967 when decedent proposed to purchase an additional 10 percent of a corporation known as Terex which was engaged in a number of mining ventures, in exchange for $500,000 worth of Texas Gulf Sulphur stock, decedent’s children and attorney decided to seek a conservator-ship. A psychiatrist observed a conversation between decedent and his attorney in the attorney’s office and observed that decedent indicated considerable confusion, rambling, and loss of train of thought. Confusion
 
 *869
 
 was indicated in that decedent’s answers to certain questions were inconsistent with facts related to the psychiatrist by the attorney. The psychiatrist’s diagnosis was organic brain changes resulting from the aging process and arteriosclerosis, and he concluded that decedent was apt to be imposed upon and met the test required for a conservatorship.
 
 [1]
 

 A list of personal property assets of decedent attached to the petition for conservatorship estimated his gross personal property assets at $4,198 million and the net value at $1,870 million. This exhibit did not include all of decedent’s assets, such as his farm in Missouri, nor did it include all of decedent’s liabilities. Decedent’s net estate was between $1 million and $1.5 million.
 

 Contentions
 

 On this appeal defendant contends (1) that the evidence is insufficient to support any other conclusion than that decedent was suffering from delusions affecting the validity of the pledge; (2) that the evidence is insufficient to support any other conclusion than that the pledge was not a debt such as a reasonably prudent person might incur; (3) that certain funds included in the judgment were not reasonably within the scope of the matching pledge; and (4) that the judgment erroneously includes an award of interest.
 

 Sufficiency Of Evidence
 

 Defendant argues the evidence is insufficient to support the judgment because the only reasonable conclusions which may be drawn from the evidence are that decedent’s pledge was voidable because prompted by “delusions of great wealth,” or that the pledge was not a debt “such as a reasonably prudent person might incur” which a conservator must pay under Probate Code section 1858. In making this argument, defendant bears a heavy burden. On appeal we must view the evidence in the light most favorable to the judgment, resolving all questions of conflicts in the
 
 *870
 
 evidence and credibility of witnesses in favor of respondent. Furthermore, we must indulge all reasonable inferences the trier of fact could make. We cannot reweigh the evidence.
 
 (Foreman & Clark Corp.
 
 v.
 
 Fallon,
 
 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362];
 
 Still
 
 v.
 
 Plaza Marina Commercial Corp.,
 
 21 Cal.App.3d 378, 384-385 [98 Cal.Rptr. 414];
 
 Kanner v. Globe Bottling Co.,
 
 273 Cal.App.2d 559, 564 [78 Cal.Rptr. 25].)
 

 Defendant argues that the pledge was the product of decedent’s “delusions of great wealth” and that the pledge is therefore voidable. Defendant points to decedent’s statement at the time of the conservator-ship proceedings that he had made $20 million on his investments in two or three years.
 
 [2]
 
 Defendant contends that the pledge must have been the product of the alleged delusion, because the amount of the pledge was insignificant compared with the imagined profits but was substantial compared with the actual net estate of between $1 million and $1.5 million.
 

 Under the authorities cited by defendant the burden is on defendant to show that decedent did not understand the nature, purpose and effect of the pledge and that, but for the alleged delusion, the pledge would not have been made.
 
 (Smalley
 
 v.
 
 Baker,
 
 262 Cal.App.2d 824, 832-836 [69 Cal.Rptr. 521];
 
 Rollins
 
 v.
 
 Smith,
 
 72 Cal.App. 773, 780-781 [238 P. 171];
 
 Crowther
 
 v.
 
 Rowlandson,
 
 27 Cal. 376, 381.) There is certainly no evidence decedent did not understand the nature and purpose of the pledge as a charitable gift. At most it is arguable that decedent did not understand the “effect” of a pledge of this size on his estate.
 

 Furthermore, we cannot say the juiy was unreasonable in concluding that defendant failed to sustain the burden of proof that but for the alleged delusion the pledge would not have been made. The pledge amounted to no more than 15 percent of the actual estate. Decedent had already been veiy generous in making gifts to his children and grandchildren during his lifetime. By giving more than $100,000,
 
 *871
 
 decedent gained the opportunity to have the stadium named after him. The jury could rationally conclude the pledge was enforceable.
 

 Defendant next attacks various aspects of the transaction and argues that under the circumstances the pledge was not what a reasonably prudent person would do. None of these arguments is persuasive to overcome the contrary reasoning of the jury. Defendant seems to assume that the $150,000 was all the university needed, and that therefore decedent’s pledge was “excessive” because decedent did not first determine how much had already been pledged and how close the university was to its goal.
 
 [3]
 
 This ignores the fact that any contributions in excess of $150,000 would further reduce the loan to be repaid in the future by students via student fees. Essentially decedent was willing to give $150,000 to the school for the stadium. He did not limit his gift to pledges made in the future in reliance on his, but was also willing to match gifts received prior to his pledge. Thus he did not need to know how much had already been raised.
 

 Defendant next argues that at the time of the pledge the conservator-ship estate had little cash and would have been required to liquidate some assets, such as Texas Gulf Sulphur stock, in order to pay the pledge, if the entire $150,000 came due at once. But that was an extremely remote possibility. The pledge was payable quarterly, and even by the time of trial, nearly eight years later, other gifts amounted only to about $105,000. Furthermore, decedent had been engaged in liquidating his Texas Gulf Sulphur stock anyway.
 
 [4]
 

 The jury could reasonably conclude that it was reasonably prudent for a man in decedent’s position to make the pledge which he did. He had been director of the mining school at the college between 1910 and 1920. He subsequently became immensely successful and wealthy, even if the wealth did not reach the extent imagined in the final years. He had been one of the two main guests of honor at the school’s centennial celebration in 1966 and was extremely pleased with the honor. He had ample reason to make a significant gift to his school. There is no suggestion by defendant that the university officials acted improperly in any way or exercised undue influence on decedent. Decedent had
 
 *872
 
 already given large gifts to his children and grandchildren. Having reached the age of 83 and with his health apparently beginning to fail, it was not unreasonable for him to want to take advantage of a unique opportunity for a kind of immortality by having the stadium named after him, so that both he and his son would be honored long after he wás gone. The evidence is sufficient to support the validity of the pledge.
 

 Inclusion Of Local Board Of Education Funds
 

 Defendant contends that the amount of contributions received from other sources erroneously included $22,500 which had been paid by the Board of Education of the City of Platteville. The previous “cow pasture” football field had been owned first by the American Legion and then by the City of Platteville. Under both owners the field was used by the local high school in addition to the university. The board of regents stipulated that if a new football stadium was built it should be available to the local high school, but that the local board of education would have to make some contribution financially to the stadium. The board of regents also required that before construction could be authorized under state auspices, $150,000 would have to be raised in the local community to show support for the stadium. To show this community support, the Board of Education of the City of Platteville agreed that it would pay $75,000 toward the stadium over a 10-year period at $7,500 per year, in addition to paying maintenance costs when the high school actually used the stadium. This $75,000 agreement was considered by the university and the board of regents as part of the $150,000 to be generated from community and private sources. At the time of trial three annual payments totaling $22,500 had been made. The agreement with the local board of education had been reached prior to decedent’s pledge, but decedent was not informed of it.
 

 The written pledge signed by decedent agrees to match “funds raised from other sources . . . .” Defendant argues that decedent intended only to “match gifts” to the stadium fund, and that notwithstanding the language of the written agreement decedent did not intend the matching pledge to include payments of the nature made by the local board of education. Defendant argues, “If would not be reasonable to conclude Davis ever intended to match monies to be paid under a preexisting contract (of which he had no knowledge) for use of the stadium after it was constructed any more than he would have intended to match receipts paid by concessionaires operating at the stadium.”
 

 
 *873
 
 There is no indication in the record that the distinction now urged by defendant was submitted to the jury for determination or that defendant objected below to the inclusion of this $22,500 in the amount due. In any event we do not accept defendant’s argument that the contribution by the local board of education must be construed as payment for the use of the stadium analogous to payments by a concessionaire. The local board’s payments were in addition to maintenance expense. After 10 years the payments would cease, even though the high school continued to use the stadium. The pledge by the local board was considered by the authorities as part of the commitment from community and private sources which was required before the board of regents would approve construction. In his dinner speech and the written pledge, decedent referred to all funds, not merely “gifts.” We cannot say that the evidence excludes as a matter of law the board of education payments from the scope of decedent’s pledge.
 

 Interest
 

 The judgment of $143,841.18 includes $38,902.28 interest. The pledge was payable quarterly as other contributions were received. Interest was calculated between the dates each quarterly payment became due and the date
 
 of this trial.
 
 Defendant contends the trial court erred in allowing this award of interest. This contention is correct.
 

 It is well established that where the decedent’s debt is a liquidated claim not bearing interest on its face, interest is not payable until there is an order directing the executor to pay the claim.
 
 (Hilton
 
 v.
 
 McNitt,
 
 49 Cal.2d 79, 83 [315 P.2d 1];
 
 Palmer
 
 v.
 
 Gregg,
 
 65 Cal.2d 657, 661-662 [56 Cal.Rptr. 97, 422 P.2d 985];
 
 Estate of Beach,
 
 15 Cal.3d 623, 646 [125 Cal.Rptr. 570, 542 P.2d 994];
 
 Mattes
 
 v.
 
 Pinkney, 260
 
 Cal.App.2d 491, 495 [67 Cal.Rptr. 255];
 
 Estate of Adams,
 
 174 Cal.App.2d 505, 507-508 [345 P.2d 106];
 
 Estate of Girard,
 
 110 Cal.App.2d 203, 204 [242 P.2d 669].) No distinction is drawn between claims originally allowed by the executor
 
 {Estate of Adams,
 
 supra;
 
 Estate of Girard,
 
 supra) or rejected
 
 (Palmer
 
 v.
 
 Gregg, supra
 
 [disapproving contrary cases];
 
 Mattes
 
 v.
 
 Pinkney, supra).
 

 If the decedent had lived anti had been sued on the pledge, plaintiff would have been entitled to interest as damages for the wrongful withholding of the money. (Civ. Code, §§ 3287, 3302;
 
 Nesbit
 
 v.
 
 MacDonald,
 
 203 Cal. 219, 222-223 [263 P. 1007].) The rule in probate is different, however.
 
 (Estate of Adams, supra,
 
 atpp. 507-508 [distinguishing nonprobate cases].) The court stated, “While we appreciate the hardships
 
 *874
 
 suffered by respondent creditor by the long delay in the payment of this indebtedness . . . , we are confronted with fixed precedents of probate procedure.”
 
 {Id.,
 
 at pp. 508-509.)
 

 Nesbit
 
 v.
 
 MacDonald, supra,
 
 relied upon by plaintiff, is distinguishable. There the decedent’s creditor sought interest from the estate only from the due date to the date
 
 of death.
 
 (203 Cal. at pp. 220-221.) We assume plaintiff would have been entitled to interest which. accrued during the short time between the first quarterly due date in April 1968 and decedent’s death in September 1968. Such calculation was not included in the evidence below, however, and we have no basis upon which to include it in a modified judgment. Since the trial court erroneously allowed interest up to the time of trial, the interest portion of the judgment must be stricken.
 
 [5]
 

 The judgment is modified by striking therefrom the amount of $38,902.28, which was awarded as interest. As modified, the judgment is affirmed. Each party to bear its own costs on appeal.
 

 Kaus, P. J., and Stephens, J., concurred.
 

 A petition for a rehearing was denied December 5, 1977, and the opinion was modified to read as printed above.
 

 [1]
 

 As enacted in 1957, Probate Code section 1751 provided: “Upon petition as provided in this chapter, the superior court, if satisfied by sufficient evidence of the need therefor, shall appoint a conservator of the person and property or person or property of any adult person who by reason of advanced age, illness, injury, mental weakness, intemperance, addiction to drugs or other disability, or other cause is unable properly to care for himself or for his property, or who for said causes or for any other cause is likely to be deceived or imposed upon by artful or designing persons, or for whom a guardian could be appointed under Division 4 of this code, or who voluntarily requests the same and to the satisfaction of the court establishes good cause therefor. The court, in its discretion, may appoint one or more conservators.”
 

 [2]
 

 Defendant also cites a statement by decedent overheard by Dr. Ullsvik that decedent had more control than any other person over mercury production. This was not true, according to defendant’s expert.
 

 [3]
 

 $38,000 had been pledged prior to decedent’s speech.
 

 [4]
 

 It was pointed out at trial that decedent was actually liquidating the Texas Gulf Sulphur stock at its peak value. Decedent’s son testified that selling the Texas Gulf Sulphur stock was fine with him, he only objected to decedent’s investing the proceeds in questionable mining ventures.
 

 [5]
 

 Both parties refer to matters outside the record on appeal in arguing whether defendant failed to object below to the inclusion of interest in the award. However, an erroneous allowance of interest against the estate should be corrected regardless of a claim of waiver by the executor. (See
 
 Claude T. Lindsay, Inc.
 
 v.
 
 Crocker-Anglo Nat. Bank,
 
 207 Cal.App.2d 199, 202 [24 Cal.Rptr. 3841.)