[Civ. No. 9552. First Appellate District, Division One.—July 1, 1935.]

In the Matter of the Estate of MAY LOUISE GRANT, Deceased. ALDA ROSE GRAHAM et al., Respondents, v. HELENE GRANT THORNEWILL, Appellant.

Edward A. Cunha, Harry I. Stafford, Harry J. Bias and Stanford G. Smith for Appellant.

J. Frank Murphy, Daniel A. Ryan, Thomas C. Ryan and James W. Harvey for Respondents.

OGDEN, J., *pro tem.*—This is an appeal from a judgment denying admission to probate of the will of May Louise Grant in accordance with the verdict of a jury finding her to have been of unsound mind at the time of its execution, from an order denying proponent's motion for judgment notwithstanding the verdict and from an order granting a new trial upon the issues of fraud and undue influence, verdicts upon the latter issues having been at the trial directed by the court in favor of proponent.

The testatrix died on November 23, 1930, at the age of sixty-nine years leaving an estate of the estimated value of between three and five hundred thousand dollars consisting, in the main, of the family home in Santa Cruz County and an interest in the Florists Review Publishing Company which produced an income of over twenty thousand dollars annually. She left surviving her four daughters, all adults, Mrs. Maude E. Jaeger, the two contestants, Mrs. Alda Rose Graham and Mrs. Bessie May Olive, and the proponent and appellant Mrs. Helene Grant Thornewill.

By the terms of the will, which was executed on the eighteenth day of February, 1927, the proponent, who is the youngest of the daughters, is made the sole beneficiary. Mrs. Graham and Mrs. Olive contest the probate of the will upon the grounds of unsoundness of mind, fraud and undue influ-

ence. The eldest daughter, Mrs. Jaeger, refused to join in the contest and at the trial testified in favor of proponent. The single question presented upon this appeal is the sufficiency of the evidence to justify the verdict of the jury finding the testatrix to have been of unsound mind and the order of the trial court granting a new trial upon the issues of fraud and undue influence.

In the year 1902 the decedent, with her husband and children, moved to the county of Santa Cruz from the city of Chicago, Illinois, where Mr. Grant had founded the publishing company which continued to so bountifully provide for his family. Mr. Grant died testate in the year 1913 leaving one-half of his estate to his widow and the remainder in equal shares to his four daughters and a son who later died. Decedent continued to live at the family home near Santa Cruz until her death, except for brief intervals living alone with the proponent, who was her constant companion. Although the evidence discloses the natural relationship of mother and daughter existing as to the eldest and youngest daughters, the two contestants were apparently neither close to nor at times upon friendly terms with decedent. Although the contestant Mrs. Olive resided in the city of Santa Cruz she saw her mother but seldom and could not say definitely whether she had seen her within a year prior to the execution of the will. The contestant Mrs. Graham saw her mother on but three occasions in the last fifteen years of her life.

It is the contention of contestants that this strained relationship was due to a complete change in the personality of decedent commencing at about the time of her husband's death in 1913, due to a mental disturbance occasioned by her period of menopause, as a result of which she changed from a sedate and conventional matron and devoted mother to a giddy, pleasure-loving, man-struck woman and a cold and indifferent mother incapable of appreciating her relationship to her children and the nature of their claims upon her bounty.

Although the two contestants, one other lay witness and a medical expert, Dr. Joseph Catton, expressed the opinion that decedent was of unsound mind, no substantial reason in support thereof was given. In the hypothetical question asked of Dr. Catton, and upon which his testimony was alone based, is summarized all of the testimony offered in sup-

port of the claim of decedent's unsoundness of mind. In order that the character of evidence relied upon may be illustrated, we therefore quote it in full:

"Q. Doctor, assuming, if you please, a woman who died at the age of sixty-seven years from Bright's disease and cancer of the liver and spleen on November 24th, 1930, leaving a will dated February 18th, 1927; that she left surviving her four daughters, the oldest then of the age of about fifty years, the second then of the age of about forty-eight years, the third then of the age of about forty-four years, and her youngest then of the age of about thirty-two years; that in this will she left all of her property to her said youngest daughter; that she was unable to understand business transactions and that her husband had attended to everything of that nature during his lifetime; that whenever he would discuss business in her presence she would have a vacant, puzzled expression, and very often when the family would be sitting in the living room and the husband went into details of business in the presence of the daughters she would get up and leave the room; that when she was about thirty years of age she was taken severely ill with Bright's disease and was in bed for many months under the care of a trained nurse; that sometimes she knew her two older daughters and sometimes she did not; that she was out of her head a great deal of the time during that illness; that while she was convalescing she was hysterical and would laugh and cry, and changed so much that the three younger children, who had been sent away, did not know their own mother when they were brought home; that from that time on during the balance of her lifetime she was off and on under the care of a doctor for this Bright's disease; that when about fifty years old, shortly before her husband's death, which occurred in May, 1913, she showed a liking for the family chauffeur, and on one occasion she told a daughter that she was tired of giving her time to her husband, that she had been giving too much of her time to him and that she wanted some gay life, and spent certain evenings with the chauffeur on the porch of the family dwelling; that while her husband was dying she allowed him to sit in her husband's chair in the living room and smoke her husband's cigars, taking the posture which had previously been assumed by her husband; that two or three days before her husband's death, when one of her daughhers protested at this

attitude on her part, she told her daughter to mind her own business as it was all right, and upon the arrival of another daughter from the south the mother stated that she thought it best that both of these daughters leave for the night; that on the next morning, while her husband was dying and the children had gathered around his bed, she permitted this chauffeur to put his arms around her and she laid her head upon his shoulder and went outside into the corridor with him, but she refused to permit a daughter to put her arms around her; and later, just before the funeral when she was asked what she was doing with regard to the body, she stated that this chauffeur had seen to everything; and upon the same day upon which her husband passed away this chauffeur assumed the head of the table in the father's place—the husband's place; that within a month or two after her husband had passed away she, the decedent, permitted the chauffeur to spoon with her and permitted him to use the family car when he was under the influence of liquor, for his own use and pleasure; that she bragged about her allurements and said to one of her daughters that once when she had on a thin summer dress she was standing in the doorway and the sun was in such a position that one could see right through the dress, and that this chauffeur stood off on the front porch and admired the outlines of her form through this dress, saying to her that it was all and more than he had expected, and that she seemed very much pleased; that at or about the time of her husband's death she stated to one of her daughters that she preferred strangers to her own; that previous to her husband's death she had led a quiet and sedate life, being devoted to her husband; that after the death of her husband there was a change in her life and she conducted herself contrary to her former habits; that on a visit south to see one of her daughters in October, 1914, less than a year and a half after her husband passed away, she became frivolous and insisted in taking this daughter around to cabarets, and she encouraged the approach of strange men in cabarets; and in the hotel where she was stopping there was a man whom the daughter knew slightly, but she, the mother, did not know at all, but she made up with the stranger and insisted that the daughter invité him to travel with her, the daughter, to Overlook, the mother's residence in Soquel, and said that she would entertain him there; that to travel there would cause them to be on the train overnight, and that

was all foreign and contrary to her habits, and the children were not brought up to conduct themselves in such a manner; that on one occasion in the year 1914, when she was cabareting she called a taxi, but instead of getting in immediately she put her foot on the step and talked to the taxi driver for fifteen minutes about the condition of her ankle which she had just sprained, and went on and told him in detail about the condition of her leg; that one daughter told her that the management of the Alexandria Hotel in Los Angeles had offered her, the daughter, a position as a cabaret singer, and the mother thought it would be wonderful, although the daughter had not been a cabaret singer at any time; that in 1924, when asked by one of her daughters if she left all of her property to Helene, the youngest daughter, she said 'yes' in a broken and sobbing voice; and when the daughter said 'It is not enough that Helene has robbed us of your love and companionship all these years, but you must leave her everything,' she trembled and said in a sobbing voice 'I had to do it, I had to do it, I had to do it'; that she overdressed and spent little time at home, entertained a different set of people from those whom she had entertained during the lifetime of her husband, and that these people were of frivolous tendencies, and she spent more of her time in San Francisco at hotels, and she spoke of her wine cellar, of its being well stocked, and stated that the youngest daughter was good at cocktail mixing; and once when she showed a friend some boxes, bottles and kegs of liquor that a man gave to her youngest daughter, when the friend asked her, 'You certainly wouldn't allow a man to give your daughter liquor?' she laughed and said 'Yes, isn't that a nice kind of beau to have?'; that in 1916 she took up new dance steps and remarked how good she was at it, and how good she was becoming, and stated that the young man that was teaching her and with whom she loved to dance was 'Peach Blossom', who was nicknamed after the special cocktail for which he had shown a preference; that she stated that she visited a man known as 'Bright Eyes', stating that his nickname had also been derived from his favorite cocktail; that she stated that 'Bright Eyes' admired her charms, and she told about visiting cafes in San Francisco; that at a Christmas party given at a Santa Cruz hotel in 1922 one woman became very ill from drinking in the rooms occupied by her together with her youngest daughter while she, the mother, was present, and

when spoken to by another daughter who had just arrived she said 'It is all right'; that in 1921 she was one of the spectators in a theater where her youngest daughter appeared on the stage in nothing but her underwear, to be draped by a male employee of a certain store, and that later, to a close woman acquaintance and to another daughter she expressed approval of this conduct on the part of the youngest daughter, and also told to the daughter of an occasion when she was draped herself; that she related to a close woman friend that a man who visited Overlook, her place of residence, told her it would be very much easier on her if she would allow him to keep her instead of having all those young boys there, and that, when asked what she did, she replied, 'Nothing, as he was going to leave the next day', and she seemed pleased; and that when this same woman friend asked her why she did not arrange for her only living son to stay at Overlook during his illness, as it would be high and there would be no danger, she said, 'Oh, yes, there would be danger to Grant', who was her young grandson,—the son spoken of being suffering from tuberculosis; that previous to her husband's death she had been solicitous and affectionate in her attitude toward all the children in the family; that after her husband's death she appeared to lack love and feeling for her children with the exception of her youngest daughter; that when she knew the husband of one of her daughters had mistreated her daughter and that the daughter divorced him, and also knew that this daughter was suffering from a serious health condition, she nevertheless neglected the daughter but was seen often in the company of the daughter's divorced husband thereafter; that when her only living son joined the army in 1918 she did not worry about him, and later when he caught double pneumonia she laughed and said that 'Edwin is always catching something', and was unconcerned in regard to his health; and when he was discharged from the army one daughter told her in 1922 that this son had symptoms of tuberculosis and she stated that she, his mother, should look out for him as he was the last of ten generations of Grants, the family name, and that if he should die there would be no one to carry on the name, and she stated, 'Well, I don't see what you tell me that for, there is nothing I can do'; and when asked why she did not take him to her home at Overlook, her large estate consisting of ninety acres, at an elevation of 800 feet, and upon which there

was a large house and buildings for the help and cattle and chickens, and cows for milk, she became very impatient and said, 'I could not take him up there because I could not have him'; and on another occasion she stated the Government ought to take care of him, and she never visited him while he was confined in the government hospitals in Arizona and Texas; that during all of these years she enjoyed a large income; that when her son was confined in the government hospital at Palo Alto and asked that his mother come to visit him she said 'I will later—Helene thinks it would be too hard on me', Helene being her youngest daughter, and she sent a man to see her son, a man whom he did not know; and that when discussing her son stated on some occasions he would be better off dead; that in the year 1926 when her son was residing in Calexico for his health, she called upon him and remained with him only an hour, did not leave her machine, and manifested very little interest and no sorrow and did not embrace him,— Doctor, in your opinion, was that woman of sound or unsound mind?''

Without here discussing the evidence offered by proponent, most of which was uncontradicted and unimpeached, in explanation of the various incidents referred to, it is sufficient to say that the foregoing facts, even if all are considered to be proven, fall far short of evidencing a lack of testamentary capacity. Although they might indicate from a purely medical standpoint some, as expressed by the medical expert, ''involutional psychosis'', it is not every mental departure from the normal that will destroy testamentary disposition. (*Estate of Chevallier*, 159 Cal. 161 [113 Pac. 130].)

■ Mental derangement sufficient to invalidate a will must be insanity in one of two forms: (1) insanity of such broad character as to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion (*Estate of Chevallier, supra; Estate of Collins,* 174 Cal. 663 [164 Pac. 1110]; *Estate of Redfield,* 116 Cal. 637 [48 Pac. 794]; *Estate of Casarotti,* 184 Cal. 73 [192 Pac. 1085]; *Estate of Finkler,* 3 Cal. (2d) 584 [46 Pac. (2d) 149]). ■ A testator is of sound and disposing mind and memory, if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, and to understand and recollect the nature

and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument. (*Estate of Smith*, 200 Cal. 152 [252 Pac. 325]; *Estate of Sexton*, 199 Cal. 759 [251 Pac. 778].) ▮ We think it apparent that the character of evidence relied upon by contestants does not meet the above tests of testamentary capacity. Fifty witnesses, both those who knew deceased socially and had transacted business with her, testified as to her sanity and as to the normalcy of her conduct and habits and ability to understand and transact affairs of business. That deceased possessed sufficient mental capacity to make testamentary disposition of her property is affirmatively shown by the evidence not only of proponent but also of contestants. Even from the testimony of the latter can be drawn no inference but that decedent understood the nature and extent of her property and her relationship to all of her children.

▮ Nor is there any evidence tending to show the perpetration of fraud or the exercise of undue influence on the part of proponent in procuring the execution of the will. Although a close and confidential relationship existed between decedent and proponent and the latter advised and counseled her mother in business affairs and wrote checks for her signature, there is no indication of any undue advantage having been taken of this natural relationship of mother and daughter. Nor is there any substantial evidence of the testamentary act of decedent having been affected by any attempt upon the part of proponent to prejudice her mother against the contestants. Although apparently the lack of sisterly devotion existing between proponent and the two contestants was at times made known to decedent by the former there is no showing that her testamentary act was in any way affected thereby. The isolated statements of proponent to decedent in the presence of and referring to one or the other of contestants such as "She isn't any good to herself or anyone else—she doesn't care anything about you nor any one— she is just after your money—just what she can get out of you", fall far short of showing such a continued and successful effort on the part of proponent to prejudice and influence her mother against contestants as is referred to in the case

of *Estate of Newhall,* 190 Cal. 709 [214 Pac. 231, 28 A. L. R. 778].

In the year 1923, a similar will in which proponent was made the sole beneficiary was executed by decedent. Shortly thereafter decedent discussed the execution and terms of this will with one of the contestants saying "I had to do it." No indication was given, however, that she was influenced or required to make such will by any act or conduct of proponent. Although at the time of the execution of the present will proponent accompanied decedent to the office of the attorney who drafted it and who had previously acted as attorney for both decedent and proponent, and upon the next day proponent drove decedent to the office but did not accompany her out of the automobile while she executed the will in the office and in the presence of the president of the Santa Cruz Land Title Company, no inference can be found therefrom that proponent influenced its execution or the terms thereof. About six months after the execution of the will decedent called at the office of her attorney and left with him a letter in her own handwriting in which she stated in substance that she omitted to make provision for either of the contestants because of the heartaches that they had caused her and stating "unnatural deeds create unnatural feelings". She also left enclosed in the letter complaining and fault-finding letters written to her by each of the contestants.

■ The rule is, as recently stated in *Estate of Finkler, supra,* quoting from *Estate of Hamburger,* 126 Cal. App. 455 [14 Pac. (2d) 802], "Proof, to establish undue influence, must be had of a pressure which overpowers the mind and bears down the volition of the testator at the time the will is made. It consists in the exercise of acts or conduct by which the mind of the testator is subjugated to the will of the person operating upon it (*Estate of Holloway,* 195 Cal. 711 [235 Pac. 1012]; *Estate of Anderson,* 185 Cal. 700 [198 Pac. 407]). Mere proof of opportunity to influence a testator's mind, even when coupled with an interest or motive to do so, will not sustain a finding of undue influence in the absence of testimony showing that there was a pressure operating directly on the testamentary act and to such an extent as to affect the terms of the testament (*Estate of Fleming,* 199 Cal. 750 [251 Pac. 637]; *Estate of Bryson,* 191 Cal. 521 [217 Pac. 525]). ■ It is not sufficient for a contestant merely

to prove circumstances consistent with the exercise of undue influence, but, before a will can be overthrown, the circumstances proved must be inconsistent with voluntary action on the part of the testator. (*Estate of Morcel,* 162 Cal. 188 [121 Pac. 733].) '' Although the testimony in the present case might be said to show circumstances consistent with the exercise of undue influence, it utterly fails to show the exercise of such influence or the lack of voluntary action on the part of the testatrix.

We conclude, therefore, that there being an insufficiency of evidence to justify the verdict of the jury upon the issue of unsoundness of mind, the motion of proponent for judgment notwithstanding the verdict should have been granted. Likewise, there being a failure of proof upon the issues of fraud and undue influence, the trial court properly directed verdicts in favor of proponent upon those issues and erred in subsequently granting a new trial thereon.

We see no gainful purpose in ordering a new trial upon any of the issues here involved. Contestants have apparently already presented their complete case, which falls far short of being sufficient to justify the exclusion from probate of decedent's will. The judgment and the order granting a new trial are reversed with directions to the trial court to enter judgment admitting the will to probate.

Tyler, P. J., and Cashin, J., concurred.

A petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 29, 1935.